FILED

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

2017 FEB -7 PM 3: 41

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

---

FLORIDA ABOLITIONIST and JANE
DOE,

                    Plaintiffs,

         -against-

BACKPAGE.COM LLC,
EVILEMPIRE.COM, BIGCITY.COM,
CARL FERRER, MICHAEL LACEY, and
JAMES LARKIN,
                    Defendants.

Civil Action No. 6:17-CV-218-ORL-28-TBS

**CIVIL COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

---

Plaintiffs Florida Abolitionist and Jane Doe (collectively, "Plaintiffs"), by and

through their undersigned attorneys, allege upon personal knowledge of their own acts

and status and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This case seeks to hold Defendants accountable for creating online content

designed to facilitate sex trafficking and for deliberately obscuring evidence of criminal

behavior to ensure that they continue to profit from the exploitation of children for sex.

Indeed, Defendants made millions of dollars in profits each year from websites that they

designed and intended to be used, and that they knew were being used, for illegal sex

trafficking, including of children.

2.      Defendants were repeatedly notified that their websites facilitated human

sex trafficking by law enforcement in multiple states, by all 51 state attorneys general,

and by the United States Senate, which passed two resolutions condemning Backpage for its involvement in child sex trafficking.

3.      Human trafficking includes selling, soliciting, or advertising the sexual acts of children and coerced adults.  Sex trafficking victims are forced to have sex against their will, while others profit.  The traffickers that Defendants assist use multiple methods to force trafficked adults and children to exchange sex for something of value.  These techniques include physical violence, threats, psychological manipulation, intimidation, and fraud, among other methods.  Human trafficking generates billions of dollars each year, making it the second most profitable transnational crime (after drug trafficking). Human Trafficking Investigation: Hearing before the S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Sec. and Gov't Affairs, 114th Cong. 53-88 (2015) (Staff Report) at 4, *available at* http://www.hsgac.senate.gov/subcommittees/investigations/hearings/human-trafficking-investigation (hereinafter, "Senate Report").

4.      In the United States, 1.5 million people are trafficked at any given point in time. *Child Trafficking Statistics*, Ark of Hope (Mar. 19, 2016), *available at* http://arkofhopeforchildren.org/child-trafficking/child-trafficking-statistics.  The majority of sex-trafficking victims in the United States are children.  Senate Report at 4.  63% of children trafficked for sexual acts reported that they were advertised or sold online. Vanessa Bouché, *A Report on the Use of Technology to Recruit, Groom, and Sell Domestic Minor Sex Trafficking Victims* (Jan. 2015) at 19, *available at* https://www.wearethorn.org/wp-content/uploads/2015/02/Survivor_Survey_r5.pdf.  In

2015, the National Center for Missing and Exploited Children ("NCMEC"), the leading

organization for resources and information about missing and exploited children, reported

that at least 71% of the reports it receives of trafficked children involve Backpage.com.

Senate Report at 6.

  5. Several examples of advertisements found on Backpage are excerpted

below.  According to NCMEC and law enforcement, these advertisements were used to

sell the sexual services of a trafficked child:

> "♡♥♡♥Exotic Young and Inexperienced ♥♡♥♡I dont know no better♥♡♥♡Soo i
> might just do it♥♡♥♡ - 18 you didn't get to see HERE'S YOUR CHANCE.. REAL
> PIC, NO RUSH PLUS I LIKE. WHAT I DO EVEN THOUGH I JUST
> STARTED"

> 3 juicy wet kitties ready to be played with as we rotate around we please
> you with warming attitudes and open minded decisions were everything
> you been looking for

  6. Defendants actively participate in the creation of advertisements that

traffic children by providing content, authoring text, deleting text, and editing

information.  Defendants also change the content of advertisements submitted by

traffickers with code words.  Defendants rewrite the advertisements in part to obscure the

illegal activity—the sale of a trafficked adult or child for sex.  Of course, the age of the

child, or the nature of the illegal transaction proposed, does not change merely because

she is no longer described as "young" or a "lolita."

  7. Defendants conspired and continue to conspire with traffickers to ensure

that the advertisements posted on Backpage are successful, earning both Backpage and

the traffickers enormous profits from the sexual exploitation of children and coerced adults.

8.      The United States Senate Permanent Subcommittee on Investigations (the "Subcommittee") commissioned a 20-month investigation of online sex trafficking that resulted in the review of over one billion pages of documents, a public hearing, and the release of two incriminating reports.  The United States Senate reported that its "investigation reveals that Backpage clearly understands that a substantial amount of child sex trafficking takes place on its website."  Human Trafficking Investigation: Hearing before the S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Sec. and Gov't Affairs, 115th Cong. 53-88 (2017) (Staff Report) at 4, available at https://www.hsgac.senate.gov/subcommittees/investigations/reports (hereinafter, "2017 Senate Report") at 39.  The United States Senate identified Backpage as the "most important player" in the sex trafficking market and reported that "public records reveal hundreds of reported cases of underage sex trafficking connected to Backpage."  Senate Report at 1.

9.      Plaintiff Jane Doe was trafficked on March 30, 2013, when her traffickers posted her photograph and an advertisement offering her for sexual services on Backpage without Ms. Doe's consent or authorization.  Five different individuals responded to the advertisement for Ms. Doe on Backpage, resulting in her being raped and sold at least five times in a period of 12 hours.  Defendants knowingly participated in, and benefited financially from, the unlawful sexual exploitation of Plaintiff Doe.

10.     Plaintiff Florida Abolitionist, Inc. ("Florida Abolitionist") is a 501(c)(3) non-profit organization in Orlando, Florida, whose main mission is to combat and end human trafficking and other forms of modern-day human slavery. Florida Abolitionist also provides direct services to trafficked adults and children. Backpage's participation in, and facilitation of, sex trafficking has increased the number of trafficked adults and children that Florida Abolitionist treats. Backpage has also caused Florida Abolitionist to expend more resources providing services to trafficked adults and children than it would have otherwise, thereby decreasing, diverting, and draining the resources devoted to its main mission of preventing and ending human trafficking. Defendants' actions thus frustrated Florida Abolitionist's mission including in that it diverted significant resources, time, staff, and funds from its mission to end human trafficking in order to provide the necessary support and shelter to trafficking victims.

## THE PARTIES

11.     Defendant Backpage.com LLC is a Delaware Limited Liability Company with its principal place of business in Dallas, Texas. Backpage.com LLC owns, operates, designs, and controls the website that does business as Backpage.com ("Backpage"), including its content. At all times material hereto, Defendant Backpage.com LLC transacted business in Florida.

12.     Defendant EvilEmpire.com is a website whose content, services, and features are controlled by Backpage.com LLC. Defendant EvilEmpire.com is owned and operated by the same Defendants that own and operate Backpage.com LLC. At all times material hereto, Defendant EvilEmpire.com transacted business in Florida.

13.     Defendant BigCity.com is a website whose content, services, and features are controlled by Backpage.com LLC. Defendant BigCity.com is owned and operated by the same Defendants that own and operate Backpage.com LLC. At all times material hereto, Defendant BigCity.com transacted business in Florida.

14.     Defendant Carl Ferrer is the CEO of Backpage.com LLC and is an owner of Defendant Dartmoor Holdings LLC. Defendant Ferrer is also the CEO of Defendant Classified Solutions LTD. At all times material hereto, Defendant Ferrer transacted business in Florida, including through Backpage.

15.     Defendant Michael Lacey is an owner of Backpage.com LLC. At all times material hereto, Defendant Lacey transacted business in Florida, including through Backpage.

16.     Defendant James Larkin is an owner of Backpage.com LLC and is the CEO and President of Defendant Website Technologies, LLC. At all times material hereto, Defendant Larkin transacted business in Florida, including through Backpage.

17.     Plaintiff Florida Abolitionist is a non-profit 501(c)(3) organization based in Orlando, Florida whose mission is to end human trafficking.

18.     Plaintiff Jane Doe is an individual that was trafficked on Backpage in May 2013 and repeatedly raped as a result of the advertisement placed on Backpage.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1595 over the claims alleging violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 *et seq.* This Court has

supplemental jurisdiction over Plaintiffs' state law claims for relief pursuant to 28 U.S.C.

§ 1367, as those claims are substantially related to Plaintiff's TVPRA claims and arise

from a common nucleus of operative facts, and thus form part of the same case or

controversy under Article III of the United States Constitution.

20.    This Court has personal jurisdiction over Defendants because each of them

knowingly committed acts in Florida that form the basis of the action, directed or

conspired with others to commit acts in Florida, and purposely availed themselves of the

privileges of doing business in Florida as set forth herein.

21.    This Court also has jurisdiction under 28 U.S.C. § 1332(a) because at the

time this action was filed (i) there was complete diversity of citizenship between the

parties, and (ii) the amount in controversy exceeds $75,000.

22.    Venue is proper in this District and before this Court pursuant to 28 U.S.C.

§ 1391(b)(2) because events giving rise to Plaintiffs' claims occurred in this District,

including among other things, Defendants' knowing participation in and profiting from

sex trafficking.

## BACKGROUND

### Backpage Knowingly Profits From Sex Trafficking

23.    In 2009, Craigslist.org, an online website that allows individuals to sell

and buy personal goods and services, removed listings for "Adult Services" from its

website.  As a result, online sex trafficking declined by 50%.  After Craiglist.org's exit

from this market, Backpage, formerly a part of the Village Voice newspaper, changed its

online advertising model to concentrate on, and quickly dominate, the market for advertising victims of sex trafficking, including underage children.

24.     Backpage quickly cornered the market for advertisements selling sex. In 2013, Backpage generated and collected 80% of all revenue derived from online commercial sexual advertisements. Senate Report at 6. Backpage thus grew increasingly dependent on the sale of sex to remain a profitable company. "Backpage's internal revenue reports show that from January 2013 to March 2015, 99% of Backpage's worldwide income was directly attributable to the 'adult' section." Press Release, *Attorney General Kamala D. Harris Announces Criminal Charges Against Senior Corporate Officers of Backpage.com for Profiting from Prostitution and Arrest of Carl Ferrer, CEO*, State of California Department of Justice Office of the Attorney General (Oct. 6, 2016) *available at* https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior (hereinafter "California Office of Attorney General Press Release").

25.     The "Adult Services" section on Backpage has traditionally hosted numerous advertisements for trafficked adults and children. Within the "Adult Services" section, Backpage created three subcategories of services through which it channels advertisements selling trafficked adults and children. These subsections within the "Adult Services" section include: "escorts," "male escorts," and "body rubs." As Defendants knew and intended, traffickers and their clientele understand that these three subcategories provide access to buying, among other things, sex with children and coerced adults.

26.     For at least the past five years, Defendants have been on notice that its websites unlawfully traffic adults and children.  On September 16, 2011, all 51 state attorneys general sent a letter to Backpage explaining their outrage "about human trafficking, especially the trafficking of minors" on Backpage.  *See* National Association of Attorneys General Letter (Sept. 16, 2011), *available at* http://www.naag.org/assets/files/pdf/signons/Backpage.com%20FINAL%209-16-11.pdf (hereinafter "NAAG Letter").  In the letter, the National Association of Attorneys General identified Backpage as a "hub" for human trafficking that "has proven particularly enticing for those seeking to sexually exploit minors." *Id.* The letter also requested that Backpage provide documentation of any policies or procedures implemented to prevent sex trafficking.  Backpage refused.  Senate Report at 7.

27.     Backpage officials also refused to testify at a Subcommittee hearing on January 9, 2017, and instead invoked their Fifth Amendment right against self-incrimination.  The night before the hearing, Defendants purported to shut down the "Adult Services" section of Backpage.  However, in reality, Defendants simply diverted the advertisements that had formerly been placed in the "Adult Services" section to the "Dating" section of its website.  The content of the advertisements in the "Dating" section remains substantially identical to the content previously posted in the "Adult Services" section.  As Defendants knew and intended, Backpage's traffickers and their clientele knew that the movement of the advertisements from one section to another was not intended to affect, and did not affect, their business.

## Backpage Sells Trafficked Adults And Children In Florida

28.     Backpage provides an online marketplace for 95 locales in Florida.  All of
the Florida markets and submarkets have an "Adult Services" section and a "Dating"
section.  Backpage organizes its commercial sales both by category of good or service
(like "Adult Services") and by location.  Within Florida, Backpage divides its
marketplace geographically into twenty-one cities/regions: Daytona, Fort Lauderdale,
Fort Meyers, Gainesville, Jacksonville, Keys (which encompasses multiple cities/towns),
Lakeland, Miami, Ocala, Okaloosa, Orlando, Palm Bay, Panama City, Pensacola,
Sarasota, Bradenton, Space Coast (which encompasses multiple cities/towns),  St.
Augustine, Tallahassee, Tampa, and Treasure Coast (which encompasses multiple
cities/towns).  Since Backpage's inception, Miami and Tampa have been two of
Backpage's top 20 markets nationwide.

29.     Fort Lauderdale, Miami, and Tampa are further divided into separate
submarkets.  Fort Lauderdale is divided into six submarkets: City of Ft. Lauderdale,
Coral Springs, Deerfield, Hollywood, Pompano, and Sunrise.  Miami is divided into
eleven submarkets: Coconut Grove, Coral Gables, Coral Way, Doral, Downtown,
Hialeah, Homestead, Kendall, Miami Beach, North, and West.  Tampa is divided into
four submarkets: Hernando Co, Hillsborough Co, Pasco Co, and Pinellas Co.

30.     In the course of four days in January 2017, 10,881 advertisements were
posted in the "Adult Services" section in the state of Florida.  On average, 2,720
advertisements were posted in the "Adult Services" section every day.

## Defendants Intentionally Do Not Report Or
## Remove Advertisements Trafficking Children

31. Defendants claim that they combat sex trafficking because Backpage has a reporting feature through which users can flag an advertisement that involves a minor. However, Defendants regularly decline to escalate reports of advertisements featuring trafficked children to NCMEC or to law enforcement. Despite being told by attorneys general and law enforcement that Defendants' websites are used for child trafficking, Backpage refused to take action to stop facilitating trafficking. Indeed, the United States Senate reported that a Backpage internal training guide advised Backpage employees to "escalate" a report of child exploitation *only* "when users claim their underage *immediate* family member is being exploited" and "when users claim *they* are being exploited." 2017 Senate Report at 41-42. The guidance continued that reports of child exploitation should not be escalated if they include information that "a slightly less immediate minor relative" is being exploited, advising that a "neice [sic] nephew, grandchild, cousin, etc. doesn't count." *Id.* In these situations, Defendants instructed employees to allow the advertisement of the trafficked child to remain on the website.

32. Backpage and Defendant Ferrer admonished Backpage employees for being overly cautious when removing advertisements of trafficked children. After a Backpage employee removed an advertisement because that employee believed the advertisement contained a trafficked child, Defendant Ferrer wrote in an email, "I see in the note for the account 'exploiting minors' who wrote this note and what is the verification? They don't look like minors to me in the pic." Appendix to 2017 Senate

Report at 24. A later email from Defendant Ferrer directed a Backpage employee to "go ahead and restore the ads," meaning make them visible and live on Backpage.com. *Id.*

33.     To maximize its profits, Backpage actively provided instructions to its employees to err on the side of posting advertisements, even if they suspected that the advertisement featured children for sex: **"IF IN DOUBT ABOUT UNDERAGE: the process for now should be to accept the ad and note the link."** Backpage instructed employees to delete the posting only if they were "VERY SURE PERSON IS UNDERAGE." Senate Report at 20. In a similar instruction, Backpage warned its employees that, **"Young ads do not get deleted unless they are clearly a child."** 2017 Senate Report at 40.

### Backpage's Business Model Depends On Sex Trafficking To Remain Profitable

34.     From 2011 through 2015, Backpage's business model generated revenue by charging individuals for posting advertisements in the "Adult Services" section. A trafficker who wanted to post an advertisement for a girl that is "BRLY Legal" had to pay between $12.00 and $17.00 to post a single advertisement in the "Adult Services" section.

35.     The United States Senate reported that internal Backpage documents demonstrate Backpage's dependence on the "Adult Services" advertisements for revenue. For example, in May 2011, Backpage's "Adult Services" section, nationwide, featured over 700,000 paid advertisements while other sections, like the "Automotive" section featured 429 paid advertisements and the "Jobs" section featured 3,000 paid advertisements. 2017 Senate Report at 44.

36.    The number of page views for the "Adult Services" section also demonstrates Backpage's reliance on this market.  As of May 2011, nationally, advertisements in the "Jobs" section on Backpage.com had approximately 2 million page views and the "Automotive" section had approximately 580,000 page views.  In May 2011, the "Adult Services" section, however, had over one billion page views.  2017 Senate Report at 44.  Moreover, from January 2013 to October 2015, Backpage's advertisements for the "Adult Services" section increased from 169,508 per month to 2,100,602 per month.

### Backpage Writes And Edits Advertisements For Sex Trafficking

37.    Backpage creates, develops, and posts illegal content intended to sell trafficked adults and children in the "Sponsored Ads" part of the "Adult Services" section of its website.  Traffickers pay up to $1,000 to have Backpage "enhance" their advertisements by, among other things, rewriting advertisements, adding text, summarizing text, and reorganizing the content and layout of the advertisement.

38.    The "Sponsored Ads" section of Backpage appears on the right hand of the page in the "Adult Services" section of the website.  If a trafficker pays for its advertisement to be "sponsored," it submits information to Backpage and Backpage then writes and designs the text and layout of the advertisement.  Traffickers pay for this service because they know that Backpage will write an advertisement that is more likely to be clicked on and result in a transaction than an advertisement that is written by the trafficker.

39.     Backpage also decides what text to display and what text to delete from the information submitted for a sponsored advertisement.

**Backpage Closely Reviews And Edits Every Advertisement On Its Website**

40.     Backpage employees review every advertisement before it is posted in the "Adult Services" section on the website.  Backpage employees were explicitly instructed to edit, delete, and author the content of advertisements.  Backpage directed its employees to "edit ads for explicit sexual language," and replace such language with code terms or other phrases.  For example, an email to Backpage employees stated:  "Do NOT include any verbiage that has 'suck you . . .' or 'lick your. . .'  You may edit the ad to read 'I enjoy oral' but do not include the vulgar language in the ad."  Appendix to 2017 Senate Report at 2, *available at* https://www.hsgac.senate.gov/subcommittees/investigations/reports.  The purposes and effects of Defendants' rewriting of the advertisements were to make the advertisements more effective for their intended purpose and less likely to draw legal action.  Defendants' rewriting of the advertisements did not in any way change, or seek to change, the illegal trafficking, including of children and coerced adults; indeed Defendants' rewriting of the advertisements had the purpose and effect of increasing the effectiveness of those advertisements.

41.     One aspect of Defendants' rewriting of the content displayed on their websites was referred to internally at Backpage as its "moderation" process.  This moderation process includes "editing and deleting content *within* advertisements."  Senate Report at 11 (emphasis in original).

42.     The United States Senate found that "Backpage's moderation process operated to remove explicit references to the likely illegality of the underlying transaction—not to prevent illegal conduct from taking place on its site." Senate Report at 21.

43.     For example, in reference to an advertisement discussing the price for sexual acts, Defendant Ferrer wrote to a Backpage employee that it was, "[b]etter to edit by removing bad text or removing bad language.  We will do this for a few weeks to give users a chance to adjust." Senate Report at 18.

44.     Defendant Ferrer set up this moderation process to train traffickers to use certain code words when selling children for sex.  As explained by the United States Senate, "moderators were instructed to *not* remove ads for certain violations" and to instead edit them prior to publishing so that the trafficker could "adjust." Senate Report at 17-18 (emphasis in original).  Backpage employees were instructed to "'unobtrusively' edit out problematic content while 'maintaining the essence of the ad'—and, by extension, the essence of the transaction advertised." Senate Report at 18.

## Backpage Created Automatic Filters To Knowingly Conceal Child Trafficking

45.     Backpage does more than manually edit the advertisements that illegally traffic adults and children.  Backpage also created automatic filter programs that changed the words used in advertisements.  For example, the United States Senate reported that Backpage automatically deletes the following terms from any advertisement: "lolita," "teenage," "rape," "amber alert," "little girl," "teen," "fresh," "innocent," and "school

girl." 2017 Senate Report at 2. One of these programs, was called the "Strip Term From Ad" filter.

46.    The United States Senate explained that while "the Strip Term From Ad filter changed nothing about the true nature of the advertised transaction or the real age for the person being sold for sex, thanks to the filter, Backpage's adult ads looked" in the words of Backpage employees "cleaner than ever." *Id.*

47.    The United States Senate also found that Defendant Ferrer "personally directed or approved the addition of new words to the Strip Term From Ad Filter and Backpage documents clearly show he understood their implications for child exploitation." 2017 Senate Report at 24. For example, Defendant Ferrer told a Backpage moderator that "Lolita" is "code for under aged girl[s]." 2017 Senate Report at 24.

### Backpage Teaches Traffickers How To Evade Law Enforcement

48.    Backpage designed its website to include an interactive process to help traffickers to draft unsponsored advertisements for the "Adult Services" section. Through this process, Backpage takes an active role in creating the content of even the advertisements it does not sponsor. This website feature educates traffickers on the best terms to use to attract the attention of a prospective buyer while also ensuring that the trafficker will not be identified or apprehended by law enforcement and that Backpage will not be implicated.

49.    Traffickers are coached to use code words such as "high schl" and "brly legal" rather than words that would explicitly state that a child being trafficked is under

18. As Defendants knew and intended, traffickers and their clientele understood that "high schl" and "brly legal" were code words for a child under 18.

50.     The United States Senate investigated these coaching practices and found that Backpage's claim that its filters "actively prohibit and combat illegal content" was false. Instead, Backpage "guided its users on how to easily circumvent those measures and post 'clean' ads." 2017 Senate Report at 34. Defendant Ferrer directed his employees to ensure that any banned term resulted in an error message to "help" traffickers learn the coded language necessary for posting advertisements selling trafficked children for sex. *Id.*

51.     The Senate Report explained that "at Ferrer's instruction, when a user attempted to post ads with even the most egregious banned words, the user would receive an error message identifying the problematic word choice. For example, in 2012, a user advertising sex with a 'teen' would get the error message: 'Sorry, 'teen' is a banned term.' Through simply redrafting the ad, the user would be permitted to post a sanitized offer." 2017 Senate Report at 34-35.

52.     Backpage also provides a "filter" for traffickers who attempt to include in the advertisement that the child being sold is under 18 years of age. As mentioned above, Backpage requires that the person posting an advertisement provide the age of the "ad poster." When a trafficker attempts to input an age for the person in the advertisement that is lower than 18, Backpage provides the following screen: "Oops! Sorry, the ad poster must be over 18 years of age." Backpage does not flag the ad, block the poster, or alert the authorities. Rather, Backpage allows traffickers to input a different age for the

same person in the same advertisement repeatedly—with absolutely no form of age verification—until the trafficker inputs an age of 18 or older.

53.     Backpage's "filter" is nothing more than a coaching mechanism intentionally designed by Backpage to facilitate and profit from sex trafficking. It certainly does not, as Backpage claims, prevent child trafficking—nor did Backpage ever intend for it to do so.

54.     Defendant Ferrer directly participated in this coaching process, communicating with individuals attempting to post advertisements for illegal commercial sex on Backpage. For example, in June 2009, Defendant Ferrer wrote to an individual attempting to post an advertisement on Backpage: "Could you please clean up the language of your ads before our abuse team removes the posting?" Appendix to 2017 Senate Report at 4. Also in June 2009, Defendant Ferrer instructed an individual attempting to post on Backpage to remove the "sex act pics" before posting in the future to avoid having the advertisement removed. Appendix to 2017 Senate Report at 187.

55.     Defendant Ferrer explained that Backpage needed to implement a more "consumer friendly" approach that directed moderators to "remove bad content in the post," allowing moderators to be "subjective and not cause too much damage." 2017 Senate Report at 21. Defendant Ferrer favored this approach because it did not harm "the user financially." *Id.*

56.     The United States Senate reported that Backpage and Defendant Ferrer's "direct contact with users—much like the automatic filtering process—was also successful in helping users post 'clean' content despite the illegality of the underlying

transaction." 2017 Senate Report at 35.  Defendants understood that this was the effect

of their coaching mechanism.  A December 2010 email from Backpage employees to

Defendant Ferrer reported that roughly "75% of the users we contact are converted to

compliant." Appendix to 2017 Senate Report at 187.

### Backpage Profits By Simultaneously
### Increasing Supply And Demand For Traffickers

57.      In 2015, all three major U.S. credit card companies (MasterCard,

American Express, and Visa) collectively refused to do any further business with

Backpage because Backpage profited from the sale of trafficked children for sex.  In

announcing its decision, MasterCard stated that "it has rules that prohibit our cards from

being used for illegal or brand-damaging activities.  When the activity is confirmed, we

work with the merchant's bank to resolve the situation."  Similarly, Visa stated that its

"rules prohibit our network from being used for illegal activity."

58.      After the credit card companies refused to deal with Backpage, Backpage

offered postings for advertisements in the "Adult Services" section for free.

Nevertheless, its income continued to grow as Backpage continued to charge traffickers

to "enhance" their advertisements in the "Adult Services" section.  Advertisement

enhancements allow traffickers to position their advertisements above the others listed in

the same section.  Essentially, this allows traffickers to ensure that potential purchasers of

illegal sexual acts see their advertisement first.

59.      For example, in Miami, traffickers pay $1.00 to move a listing to the top

of the webpage for an hour or $24.00 to move a listing to the top of the webpage for 24

hours. Traffickers can also ensure that their advertisements automatically repost for a
certain number of days for an additional fee between $8.00 and $192.00.

60.     The most important enhancement for traffickers is also the most harmful
to trafficking victims: Backpage allows traffickers to pay additional fees ranging from
$1.00 to $18.00 to simultaneously post an advertisement in multiple locations. Thus,
Backpage makes it possible for traffickers to sell adults and children in multiple cities
simultaneously. For example, for a $10.00 fee, an advertisement will appear in all eleven
regions of Miami: Coconut Grove, Coral Gables, Coral Way, Doral, Downtown,
Hialeah, Homestead, Kendall, Miami Beach, North, and West.

61.     By allowing traffickers to cross-post in several locales, traffickers can
move from market to market more easily, selling the same adults and children for sex in
multiple cities and states. As a result, Backpage has increased both the frequency and
success of sex trafficking.

62.     Defendants intentionally designed the website in this manner because
Defendants know that their success is directly correlated to, and dependent upon, the
success of sex trafficking. As a result of Backpage's actions, trafficking victims
regularly report being sold in multiple states in a single day or week. The United States
Senate explained that because of Backpage, "traffickers can maximize profits, evade law
enforcement detection, and maintain control of victims by transporting them quickly
within and between states." 2017 Senate Report at 5.

## Backpage Designed Its Website In Bad
## Faith To Help Traffickers Evade Prosecution

63.     Because Backpage's profitability and survival depends on sex trafficking, it has created tools, in bad faith, to ensure that traffickers are not identified and apprehended by law enforcement.

64.     Before all three major credit card companies refused to transact business with Backpage, Backpage enabled traffickers to pay for advertisements in a covert manner by permitting the use of prepaid credit cards that did not need to be linked to a name, address, or any other identifying information.

65.     After Backpage was forced to stop charging for posting an advertisement in the "Adult Services" section, Backpage emphasized its other anonymous payment options so that traffickers could pay to post their advertisements using the digital currency Bitcoin.  Because Bitcoin is not linked to a bank and is largely untraceable, it allows traffickers to provide payment for advertisement enhancements without leaving any evidence of their identity.

66.     When a trafficker posts an advertisement in the "Adult Services" section, he automatically receives certain privacy protection and identity-blocking features that are not provided for an individual posting in any other section on Backpage's website.

67.     For example, the Backpage website processes any photograph posted as part of an advertisement in the "Adult Services" section and automatically strips it of all metadata, including, but not limited to, the method used to capture the photograph, exposure setting, capture time, GPS location information, and the camera model.  This data, which resides within the photograph, would provide law enforcement with crucial

information to locate the trafficked child and apprehend the trafficker. Backpage deliberately pays an additional fee for these software adjustments to ensure that the photographs posted in the "Adult Services" section are stripped of metadata and cannot be used to identify and track sex traffickers.

68.     Defendants also allow traffickers to evade law enforcement by allowing traffickers to post their phone numbers by spelling out the digits of their telephone numbers instead of using Arabic numbers. For example, the numerals "414" can be written as "four-1-four." Such listings make it more difficult for law enforcement to scan advertisements, identify traffickers, and conduct sting operations to rescue children by scanning the Internet for certain phone numbers.

69.     Defendants designed its website so that sex traffickers would not have to verify the phone numbers they post in connection with an advertisement for a trafficked child or adult. Backpage possesses the software and technology to require telephone number verification before posting an advertisement—in fact, it requires this form of verification for other sections of its website.

70.     In effect, Backpage makes it harder for someone to sell a dog or cat in its "Pets" section than it does for someone to sell an adult or child for sex in the "Adult Services" or "Dating" sections: Anyone trying to sell a dog or cat through "Pets" must verify their telephone number, while anyone trying to sell an adult or child for sex through "Adult Services" or "Dating" does not.

71.     Backpage understands that the telephone verification process would create an additional record and evidentiary trail of the trafficker, potentially dissuading the

trafficker from using Backpage. Defendants therefore intentionally omitted this feature from the "Adults Services" section to make it easier for traffickers to evade law enforcement when they pay to post their advertisements of children and coerced adults.

### Backpage Moved Its Advertisements For
### Sexual Services To The Website's Dating Section

72.    On January 9, 2017, the United States Senate released a report titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." 2017 Senate Report. The 2017 Senate Report was the culmination of a 20-month investigation into Backpage. After reviewing over one billion pages of documents, the United States Senate Report identified three principal findings: "First, Backpage has knowingly concealed evidence of criminality by systematically editing its 'adult' ads." 2017 Senate Report at 2. "Second, Backpage knows that it facilitates prostitution and child sex trafficking." *Id.* at 3. "Third, despite the reported sale of Backpage to an undisclosed foreign company in 2014, the true beneficial owners of the company are James Larkin, Michael Lacey, and Carl Ferrer." *Id.*

73.    The 2017 Senate Report was released the same day the Subcommittee held a public hearing to investigate Backpage and online trafficking. All Backpage officials called to testify, including Defendants Ferrer, Lacey, and Larkin, invoked their Fifth Amendment right against self-incrimination and refused to provide any information to the Subcommittee.

74.    To divert attention from the 2017 Senate Report and their unwillingness to cooperate with the Subcommittee's investigation, Backpage removed the "Adult Services" section from its website on the evening before the January 9 hearing. In its

place, Backpage inserted a webpage that included, among other things, a notification that "the government has unconstitutionally censored this content."

75.     Despite this publicity stunt and Backpage's claims to the contrary, however, trafficked adults and children are still being advertised and sold on Backpage. Backpage did not actually remove its advertisements for sex, including advertisements for trafficked adults and children. Instead, it simply shifted all of these advertisements to the "Dating" section of its website.

76.     Defendants have explicitly instructed Backpage employees to hide their actions of creating content in order to ensure that courts would not understand that Defendants create content and author advertisements. The United States Senate reported that on July 28, 2011, Defendant Larkin wrote to Defendant Ferrer "cautioning him against Backpage's moderation practices 'being made public. We need to stay away from the very idea of 'editing' the posts, as you know.'" 2017 Senate Report at 17. Now that Defendants' role as a content creator *has* been "made public," however, they are subject to liability for their actions.

### Defendants Design The Content Of EvilEmpire And BigCity Advertisements To Further Trafficking

77.     Defendant EvilEmpire.com ("EvilEmpire") is owned and operated by Defendants Ferrer, Lacey, and Larkin. EvilEmpire is a website that exclusively features advertisements for "adult services," including advertisements for trafficked adults and children. Defendants provide all of the content hosted, published, and featured on EvilEmpire.com. Defendants exclusively create, maintain, and control the content posted on EvilEmpire. Third parties are unable to post on EvilEmpire directly.

78.     EvilEmpire's homepage consists of a grid of pictures of naked or nearly naked individuals in erotic poses, each with a phone number and a city and state below the picture.  Clicking on one of these advertisements redirects the purchaser to the full advertisement initially posted on Backpage.  Some of these advertisements also feature a link for the same advertisement posted on Defendant BigCity.com ("BigCity").

79.     EvilEmpire organizes and reposts advertisements posted on Backpage. EvilEmpire aggregates all advertisements that use a certain phone number on a single webpage on EvilEmpire.  That is, Evil Empire is a sex trafficker catalogue.  It creates a webpage for each trafficker, identified and sorted by his phone number, in which all of the trafficked adults and children controlled by that trafficker are featured for purchase. Often the same trafficked child will be featured in different advertisements that identify the trafficked child as being different ages and having different names, all on the same webpage.  A cursory view of such a webpage makes it clear to anyone that the advertisements for the trafficked child include false ages, as the same child is associated with multiple ages over 18.

80.     Defendants thus knowingly conspired with traffickers to make trafficking children and coerced adults more efficient by creating webpages on EvilEmpire that catalogue traffickers' advertisements.  Defendants also knowingly conspired with traffickers to falsely represent that a trafficked child was over 18, as made clear by the multiple age representations for the same individual in multiple advertisements collected on the single webpage.

81.     Defendants organized BigCity in a similar manner to EvilEmpire to increase the efficiency and demand for traffickers.  BigCity is a website that exclusively features advertisements for adult services.  Defendants Lacey, Larkin, and Ferrer own and operate BigCity.  BigCity's homepage is comprised of a grid of stitched together pictures of naked or nearly naked individuals in erotic poses; each picture is a link to that trafficked adult or child's "Profile."  The "Profile" is a webpage that contains pictures of an individual, and that individual's name, age, phone number, and location.  While EvilEmpire organizes advertisements based on the trafficker posting them, BigCity organizes advertisements based on the trafficked adult or child featured in the advertisement.

82.     Like EvilEmpire, historically, Defendants exclusively created, maintained, and controlled the content that was posted on BigCity, taking advertisements from Backpage and reposting them on BigCity.  Although there is now a feature on BigCity that allows users to post new content and create a "Profile" for themselves, Defendants continue to create the majority of the profiles on BigCity by taking content posted on Backpage.

83.     Defendants intentionally cross-post advertisements on Backpage, BigCity, and EvilEmpire.  Defendants knew well that by cross-posting they were granting traffickers greater access to those who would buy an adult or child for sex.  Thus, with Defendants' knowing and intentional aid, it became easier than ever for traffickers to turn a profit by selling the bodies of adults and children.

**Defendants Conspire With Traffickers To Sell
Children For Sex On EvilEmpire And BigCity**

84.     Defendants also conspire with the traffickers to falsely represent and hide

the fact that they are selling trafficked children.  The aggregation features on BigCity and

EvilEmpire make it clear that Defendants know that they are conspiring with traffickers

to falsely represent the age of trafficked children.  For example, sometimes the age of a

trafficked boy advertised on EvilEmpire is different from the age of the boy advertised on

Backpage, despite having the same phone number and pictures.  Similarly, sometimes the

girl advertised on BigCity is older than the girl advertised on Backpage, despite having

the same phone number and pictures.  And often, the age of the same child is listed

multiple times as different ages within advertisements on a single webpage for BigCity.

85.     Defendants also enable their trafficker co-conspirators to evade law

enforcement by stripping metadata from the photographs that are posted to EvilEmpire

and BigCity.  Stripping the metadata from these photographs prevents law enforcement

or family members of the trafficked child from searching Google for the same image or

photograph posted on Evil Empire or Big City.  Such Google image searches allow law

enforcement to locate the trafficked child more easily and quickly by cross-referencing

their different locations.  EvilEmpire and BigCity were intentionally designed by

Defendants to help traffickers posting on Backpage to increase their exposure to potential

purchasers without also increasing their exposure to law enforcement.

86.     In 2015, when credit card companies began refusing to process payments

for services to Backpage, Defendants created a web of entities designed to conceal the

transfer of funds from other entities belonging to the Defendants to Backpage.  For

example, Defendants created Postfaster.com, LLC, to operate a website that did not contain an "Adult Services" section.

87.     Defendants directed traffickers attempting to purchase advertisements on Backpage to purchase credits from Postfaster.com to use to buy advertisements on Backpage. Defendants then falsely represented to payment processors that Postfaster.com had no affiliation with Backpage, so that payment processors would transact with them despite the credit card ban.

88.     Defendants deny their affiliation with Backpage, EvilEmpire, and BigCity to make it more difficult for a trafficked adult or child, or their family members, to remove their photographs. For example, when a trafficked child contacted Backpage and requested that Backpage remove her picture from EvilEmpire, Defendants falsely replied that Backpage was not affiliated with EvilEmpire and could not remove her picture.

89.     Backpage instructed its employees to stop reporting advertisements posted on EvilEmpire that displayed pictures of trafficked children for sex. A Backpage employee emailed the following instruction to another Backpage employee: "Hey do you guys normally send out evil empire and naked city links when you reply to cops? If you do, can you stop? We own those sites too ☺." Appendix to 2017 Senate Report at 406.

## Defendants' Co-Conspirators

90.     From November 2011 to in or about December 2012, co-conspirator Jermaine Lamon Roy used Backpage.com to traffic a learning-disabled victim by force, repeatedly beating and assaulting her and, at least once, taking her to a remote location and threatening to murder her if she did not continue to engage in sex work for him. The

victim had difficulty reading, writing, and understanding complex concepts, and had previously received disability benefits due to her condition. Roy was subsequently convicted of one count of sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591.

91.     In February 2012, co-conspirator Michael Williams held a minor against her will and listed her for sex on Backpage.com, posting pictures of her in revealing clothing for these advertisements and threatening her with beatings if she attempted to see or contact her family. On multiple occasions over the course of one week, the minor was forced to provide sexual acts on unidentified buyers responding to advertisements posted on Backpage. Eventually, police raided the motel where the minor was being held, rescuing her and subsequently arresting Williams. On August 7, 2015, Williams pleaded guilty to one count of sex trafficking, in violation of 18 U.S.C. § 1591.

92.     In 2010, co-conspirator Shacon Barbee used Backpage to sell a minor girl, whom he first encountered when she was 13 years old, for sexual services. Barbee also forced her to recruit other girls also sold for sex on Backpage. Barbee was arrested and subsequently convicted of two counts of Promoting Commercial Sexual Abuse of a Minor, in violation of Wash. Rev. Code Ann. § 9.68A.101.

93.     Beginning in December 2011 and continuing through January 2012, co-conspirators Calvin Winbush and Sonora Armstrong recruited a homeless 15-year-old girl, promising her support before advertising her for sexual services on Backpage. Winbush and Armstrong then transported the minor from Ohio to Virginia, where she was coerced into performing sexual acts on clients responding to these Backpage

advertisements. Winbush and Armstrong each subsequently pleaded guilty to one count of conspiracy to transport a minor interstate for the purposes of prostitution, in violation of 18 U.S.C § 2423(e), and Winbush also pleaded guilty of transporting a minor interstate for the purposes of prostitution, in violation of 18 U.S.C § 2423(a).

94.     The unnamed traffickers responsible for trafficking the Florida Abolitionist's clients on Backpage also constitute Defendants' co-conspirators.

### Jane Doe Was Repeatedly Raped As A Result Of Backpage

95.     Jane Doe has been trafficked since the age of 11. Ms. Doe's mother suffered from a serious drug addiction and sold her daughter for sex to support her addiction. Ms. Doe was also trafficked by the drug dealers who sold drugs to her mother. Through force, coercion, threats, and violence, the traffickers and Ms. Doe's mother forced her to provide sexual services, starting at the age of 11 through the age of 26.

96.     On March 30, 2013, Ms. Doe was trafficked on Backpage. Her mother directed her, under false pretenses, to go to a hotel room. When Ms. Doe arrived at the hotel room, a man locked her inside and took her to a room with a second man. Both men raped her several times.

97.     Ms. Doe's traffickers took between 10 and 20 photographs of her without her consent and posted some of those photographs on Backpage with an advertisement selling Ms. Doe for sex.

98.     These men then created an advertisement for Ms. Doe on Backpage. Within less than ten hours, five different men responded to the Backpage advertisement posted. Also within less than ten hours, those five men repeatedly raped Ms. Doe.

99.     As a result of Ms. Doe's advertisement on Backpage and her repeated sale for sex, Ms. Doe suffered severe mental and physical trauma. Ms. Doe stopped attending college courses after these traumatic rapes because she could no longer focus on her coursework. She also missed significant periods of work between March 2013 and June 2015 due to her need to attend medical appointments and psychological therapy.

100.     Ms. Doe attended intense psychological therapy twice a week from April 2013 to June 2015. As a result of her physical trauma, this year Ms. Doe must undergo a hysterectomy at the age of 30.

101.     Ms. Doe still suffers from psychological trauma caused by the repeated rapes in March 2013 and of the shame and embarrassment caused by her photograph being featured multiple times on Backpage and her photograph being made publicly available to view and associated with the sale of sex. She also suffers from post-traumatic stress disorder as a result of Backpage's conduct and the resulting rapes.

102.     Ms. Doe serves on the Florida Abolitionist's Board of Influencers.

### Backpage Has Caused Harmed To Florida Abolitionist

103.     Florida Abolitionist is a non-profit 501(c)(3) organization based in Orlando, Florida, whose mission is to end human trafficking. Florida Abolitionist accomplishes their mission by creating preventative and restorative solutions to end human trafficking. Florida Abolitionist also co-founded the Greater Orlando Human Trafficking Task Force, whose singular focus is to provide a human rights-based, victim-centered community forum and mechanism to combat all aspects of human trafficking in the greater Orlando area.

104.     Florida Abolitionist is a member organization with various programs, including victim services, and approximately 65 active volunteers.  Florida Abolitionist has a Board of Directors and a Board of Influencers ("Advisory Board") (collectively, the "Boards").  Trafficking survivors serve on both Boards and both Boards play a role in providing guidance to Florida Abolitionist.

105.     Trafficking victims who obtain services from Florida Abolitionist have a role in governing the organization.  They are invited to weekly meetings and provide feedback on services provided by Florida Abolitionist.

106.     Florida Abolitionist also has approximately 5,000 partners involved in a variety of ways.  Partners include financial contributors, volunteers, and people who have signed up to receive updates about the Florida Abolitionist's activities.  Partners receive monthly newsletters, as well as text message alerts, invitations to special events, and notifications of trainings that occur.  Many of these partners are involved through hosting trainings at congregations, businesses, or their civic groups.

107.     Florida Abolitionist provides speakers to train individuals, professionals, businesses, organizational leaders, clergy, and law enforcement how to combat and end human trafficking.  Florida Abolitionist also provides a monthly training session that covers the topics of awareness and prevention, focusing on the root causes of human trafficking.

108.     The number of reports of human trafficking made to the Florida Abuse Hotline has increased each year since 2010.  From 2014 to 2015, for example, the number of reports of human trafficking increased by 54%.  Florida Department of Children and

Families Annual Human Trafficking Report, 2014-15 Federal Fiscal Year, *available at*

https://www.dcf.state.fl.us/programs/childwelfare/docs/2015LMRs/Human%20Traffickin

g%20Annual%20Report.pdf (hereinafter, "2015 DCF Report").

109.    The Florida Department of Children and Families ("DCF") reported that in

2015, alone, DCF received 1,892 reports of human trafficking.  2015 DCF Report.  In

2015, DCF allocated $3 million to serve the needs of trafficked children. *Id.*

110.    As a result of the increase in sex trafficking, Florida Abolitionist has

diverted its resources from its main mission to end human trafficking to provide

treatment and services to trafficking victims.  This drain of resources has frustrated

Florida Abolitionist's mission.

111.    Florida Abolitionist has a Victim Services program that includes social

service assessments of trafficking victims, psychological evaluations, and overall

comprehensive case management, as well as providing individual victim advocates to

trafficked adults.  Florida Abolitionist also created a sex trafficking hotline that is staffed

24 hours a day, seven days a week, and which receives at least 600 calls per year.  In

2016, Florida Abolitionist provided services to approximately 275 of the 654 individuals

that called its sex trafficking hotline.  About 50 of these individuals became formal

clients of Florida Abolitionist for whom they provided services, care, shelter, and

support.  For all 275 individuals, Florida Abolitionist provided services including

transportation, identification and coordination of medical care, psychological evaluations

and needs assessments, and assistance finding a residential program or affordable

housing.

112.    Florida Abolitionist spends approximately 50-60 hours per year providing services to each individual trafficking survivor who is a client.  These services include weekly calls or visits, monitoring and supervision by a social worker, assistance finding employment, and miscellaneous assistance to help the survivor reintegrate into society.

113.    Backpage's unlawful activity has increased the number of sex trafficking victims, especially child victims.  This has forced Florida Abolitionist to increase its case load and to spend a significant amount of time ensuring that child victims receive the social services they require, decreasing the organization's ability to offer "comprehensive case management" to victims, limiting its education and prevention efforts, harming its ability to address labor trafficking, and forcing it to spend resources complying with state procedures applicable to child trafficking victims.

114.    Florida Abolitionist is an organization aimed at stopping modern-day slavery broadly—not just sex trafficking.  However, due to the high volume of sex trafficking victims, it has been unable to devote substantial efforts and resources into combating labor trafficking, and its mission has been frustrated as a result.  In its first year, Florida Abolitionist provided services to three sex trafficking victims.  In 2016, Florida Abolitionist expects to have provided services to over 100 sex trafficking victims. Florida Abolitionist estimates that at least half of the victims it serves were trafficked via Backpage, which has diverted and drained its resources.

115.    Florida Abolitionist has also seen an increase of child trafficking victims who need assistance and/or who are aging out of the dependency system in Florida. Florida Abolitionist has been asked by various organizations serving minors to assist with

social services needs.  Assisting minor victims requires additional staffing, expertise, and resources, many of which are mandatory under Florida State law, including reporting and documentation requirements, ensuring safety and relocation, and assisting the victim in obtaining medical care.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**(VIOLATIONS OF 18 U.S.C. § 1591 SEX TRAFFICKING)**
*By Plaintiff Doe Against All Defendants*

116.    Plaintiff Doe repeats and realleges paragraphs 1 through 115 as if fully set forth herein.

117.    Defendants' conduct "enticed" or "solicited" commercial sex acts, both involving persons under 18 and involving persons (including persons under 18) subject to "force, threats of force, fraud, and coercion."  Defendants knowingly advertised, and financially benefitted from, ventures that they knew (a) involved a person under 18 years of age engaging in "commercial sex acts" and (b) involved persons (including under the age of 18) engaging in "commercial sex acts" as the result of force, threats of force, fraud, and coercion in violation of 18 U.S.C. § 1591.

118.    As a direct and proximate cause of Defendants' conduct, Plaintiff Doe has suffered substantial physical and psychological injuries, and other damage.

## SECOND CAUSE OF ACTION

### (DISTRIBUTOR OR PUBLISHER LIABILITY)
*By Plaintiff Doe Against All Defendants*

119.   Plaintiff Doe repeats and realleges paragraphs 1 through 118 as if fully set forth herein.

120.   Defendants knowingly published, or caused to be published, defamatory matter to someone other than Plaintiff Doe.

121.   Defendants intentionally and unreasonably failed to remove the defamatory matter and photographs that were in Defendants' possession and under Defendants' control.   Defendants failed to take reasonable steps to remove the defamatory statements and photographs within Defendants' control.

122.   Defendants also negligently failed to remove the defamatory matter and photographs that were in Defendants' possession and under Defendants' control.

123.   Defendants also failed to take reasonable steps to the remove the defamatory statements and photographs within Defendants' control.

124.   As a direct and proximate cause of Defendants' conduct, Plaintiff Doe has suffered substantial physical and psychological injuries, and other damage.

## THIRD CAUSE OF ACTION

### (OUTRAGE)
*By All Plaintiffs Against All Defendants*

125.   Plaintiffs repeat and reallege paragraphs 1 through 124 as if fully set forth herein.

126.    Defendants intentionally or recklessly participated in, facilitated, and profited from selling trafficked adults and children for sex.  Defendants intentionally or recklessly authored, edited, and placed photographs and advertisements for trafficked adults and children, including photographs and advertisements of Plaintiff Doe, on Backpage.

127.    Defendants' conduct was so outrageous that it is beyond all bounds of human decency and to be regarded as odious and utterly intolerable in a civilized community.

128.    Defendants' conduct caused emotional distress that was severe, including causing severe emotional distress to Plaintiff Doe.

129.    As a direct and proximate cause of Defendants' conduct, Plaintiff Doe has suffered substantial physical and psychological injuries, and other damage.

### FOURTH CAUSE OF ACTION

### (INVASION OF PRIVACY OR RIGHT TO PUBLICITY)
### *By Plaintiff Doe Against All Defendants*

130.    Plaintiff Doe repeats and realleges paragraphs 1 through 129 as if fully set forth herein.

131.    Defendants' conduct amounted to and resulted in the unwarranted appropriation and exploitation of Plaintiff Doe's personality and the wrongful intrusion into Plaintiff Doe's private affairs and activities with which the public has no legitimate concern.

132.    Defendants' conduct also amounted to or resulted in the public disclosure of facts about Plaintiff Doe which placed her in a false light in the public eye.

133.   Defendants' conduct caused mental suffering, shame, and humiliation to Plaintiff Doe, a person of ordinary sensibilities.

134.   As a direct and proximate cause of Defendants' conduct, Plaintiff Doe has suffered substantial physical and psychological injuries, and other damage.

## FIFTH CAUSE OF ACTION

### (VIOLATIONS OF FLA. STAT. ANN. § 540.08 COMMERCIAL EXPLOITATION OF A PERSON'S NAME OR PERSONALITY)
*By Plaintiff Doe Against All Defendants*

135.   Plaintiff Doe repeats and realleges paragraphs 1 through 134 as if fully set forth herein.

136.   Defendants published, displayed, and otherwise used publicly for purposes of trade and for other commercial and advertising purposes Plaintiff Doe's image, photograph, name, and likeness without Plaintiff Doe's express written or oral consent.

137.   Plaintiff Doe's image, photograph, and likeness was not part of a bona fide news report or presentation having a current and legitimate public interest and was, instead, used for advertising purposes.

138.   As a direct and proximate cause of Defendants' conduct, Plaintiff Doe has suffered substantial physical and psychological injuries, and other damage.

## SIXTH CAUSE OF ACTION

### (CIVIL CONSPIRACY)
*By All Plaintiffs Against All Defendants*

139.   Plaintiffs repeat and reallege paragraphs 1 through 138 as if fully set forth herein.

140.    Defendants had an agreement between themselves and an agreement with trafficker co-conspirators to traffic children and coerced adults, in violation of state and federal law.

141.    Defendants edited, authored, and published advertisements on Backpage and Defendants' other websites, and obtained payment, in furtherance of this conspiracy.

142.    As a direct and proximate cause of Defendants' conduct, Plaintiff Florida Abolitionist was harmed and suffered damages.  Because of Defendants' conspiracy, Plaintiff Florida Abolitionist was forced to divert resources from its primary mission to end all forms of human trafficking and to expend resources to provide services, counseling, and support to trafficked adults and children.

143.    As a direct and proximate cause of Defendants' conduct, Plaintiff Doe was harmed and suffered damages.

## SEVENTH CAUSE OF ACTION

### (NEGLIGENCE)
### *By All Plaintiffs Against All Defendants*

144.    Plaintiffs repeat and reallege paragraphs 1 through 143 as if fully set forth herein.

145.    Defendants have a duty to avoid facilitating human trafficking and a duty to follow Florida's anti-trafficking criminal statutes.  These criminal provisions define the public policy of Florida.

146.    Defendants breached that duty because at all relevant times, they knew or should have known that traffickers used Backpage to post advertisements selling trafficked adults and children.  Defendants took no precautions to prevent that

misconduct. In fact, Defendants worked, in bad faith, with the traffickers to facilitate the trafficking.

147.    As a direct and proximate cause of Defendants' conduct, Plaintiff Florida Abolitionist was harmed and suffered damages. Plaintiff Florida Abolitionist was forced to divert resources from its primary mission to end all forms of human trafficking and to expend resources to provide services, counseling, and support to trafficked adults and children.

148.    As a direct and proximate cause of Defendants' conduct, Plaintiff Doe was harmed and suffered damages.

## DEMAND FOR JURY TRIAL

149.    Pursuant to Federal Rule of Civil Procedure 38 and the extent permitted by law, Plaintiff demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter judgment as follows:

a)    Adjudge that Defendants are liable for each cause of action stated above;

b)    For preliminary and permanent injunctive relief;

c)    For declaratory relief;

d)    For monetary damages, including compensatory, punitive, and treble damages;

e)    For all costs and fees incurred in prosecuting this Complaint;

f)    For such other and further relief as this Court deems just and proper.

February 7, 2017

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: _Karen C Dyer_

Karen C. Dyer (Fla. Bar. No. 716324)
121 South Orange Avenue
Suite 840
Orlando, FL 32801
Telephone: (407) 245-8793
Facsimile:  (407) 425-7047
kdyer@bsfllp.com

David Boies (*pro hac vice to be filed*)
*Lead Trial Counsel*
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
dboies@bsfllp.com

Karen A. Chesley (*pro hac vice to be filed*)
Joanna Wright (*pro hac vice to be filed*)
Alexander Boies (*pro hac vice to be filed*)
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile:  (212) 446-2350
kchesley@bsfllp.com
jwright@bsfllp.com
aboies@bsfllp.com

**LEGAL MOMENTUM**

Penny Venetis (*pro hac vice to be filed*)
16 East 34th Street
New York, NY 10016
Telephone: (212) 413-7544

*Attorneys for Plaintiffs Jane Doe and
Florida Abolitionist*