# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| **FLORIDA ABOLITIONIST and JANE DOE**,<br><br>          **Plaintiffs,**<br><br>   -against-<br><br>**BACKPAGE.COM LLC, EVILEMPIRE.COM, BIGCITY.COM, CARL FERRER, MICHAEL LACEY, and JAMES LARKIN,**<br>          **Defendants.** | Civil Action No. 6:17-cv-00218-JA-TBS |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
### TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (6)

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND .............................................................................. 2

ARGUMENT ...................................................................................................... 4

I.  SECTION 230 DOES NOT APPLY TO THE CLAIMS IN THIS ACTION. ............. 4

    A.  Plaintiffs Sufficiently Alleged Defendants' Liability as Content Providers. ............................................................................................ 6

    B.  Plaintiffs Have Properly Alleged That Defendants Monitored and Filtered Content In Bad Faith. ......................................................... 10

    C.  Ms. Doe's Right-of-Publicity Claim is Excluded from Section 230. ............. 12

    D.  Section 230 Cannot Reasonably Be Interpreted To Give Defendants Immunity For Willfully Facilitating Sex Trafficking. ................................... 13

II.  THERE IS NO BASIS FOR DISMISSING PLAINTIFFS' CLAIMS. ...................... 14

    A.  Plaintiffs Have Standing to Bring These Claims. ............................................ 14

    B.  Ms. Doe Has Sufficiently Alleged Her Right-of-Publicity Claims. ............... 17

    C.  Ms. Doe Sufficiently Alleged a Timely Defamation Claim. ......................... 18

    D.  Ms. Doe's Other Claims Are Not Barred by the Single Action Rule. ............ 21

    E.  Plaintiffs Have Sufficiently Alleged Civil Conspiracy. .................................. 23

    F.  Ms. Doe Has Stated A Claim Under the TVPRA. .......................................... 24

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Airbnb, Inc. v. City & Cty. of San Francisco,*
  No. 16-cv-03615, 2016 WL 6599821 (N.D. Cal. Nov. 8, 2016) ......................... 5

*Almeida v. Amazon.com, Inc.,*
  456 F.3d 1316 (11th Cir. 2006) ............................................................. 6, 12, 18

*Ashcroft v. Iqbal,*
  556 U.S. 622 (2009) ................................................................................... 5

*Barnes v. Yahoo!,*
  570 F.3d 1096 (9th Cir. 2009) ...................................................................... 5

*Barnett v. Blane,*
  No. 11-cv-14345, 2012 WL 12862653 (S.D. Fla. July 3, 2012) ..................... 19

*Brown v. Suncoast Beverage Sales, LLP,*
  No. 2:09-cv-498, 2010 WL 555675 (M.D. Fla. Feb. 10, 2010).......................... 22

*Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.,*
  831 So. 2d 204 (Fla. Dist. Ct. App. 2002) .................................................. 21

*Carroll v. TheStreet.com, Inc.,*
  No. 11-cv-81173, 2014 WL 5474061 (S.D. Fla. July 10, 2014) ..................... 21

*Chanel, Inc. v. 2012-Chanel.com,*
  No. 1:12-cv-22482, 2013 WL 12171738 (S.D. Fla. Mar. 20, 2013) ................ 23

*Charles v. Florida Foreclosure Placement Ctr., LLC,*
  988 So. 2d 1157 (Fla. Dist. Ct. App. 2008) ................................................. 23

*Comins v. Vanvoorhis,*
  135 So. 3d 545 (Fla. Dist. Ct. App. 2014) .................................................. 19

*Conant v. McCaffrey,*
  172 F.R.D. 681 (N.D. Cal. 1997).................................................................. 14

*Coton v. Televised Visual X-Ography, Inc.,*
  740 F. Supp. 2d 1299 (M.D. Fla. 2010).......................................................... 18

*Doe v. Am. Online, Inc.,*
  783 So. 2d 1010 (Fla. 2001).......................................................................... 13

*Doe v. Friendfinder Network, Inc.,*
  540 F. Supp. 2d 288 (D.N.H. 2008)................................................................ 12

*e-ventures Worldwide, LLC v. Google, Inc.,*
  188 F. Supp. 3d 1265 (M.D. Fla. 2016)....................................................... 6, 11

*Fair Hous. Council of San Fernando Valley v. Roommates.com*,
    521 F.3d 1157 (9th Cir. 2008) ............................................................ 2, 5

*Five for Entm't S.A. v. Rodriguez*,
    877 F. Supp. 2d 1321 (S.D. Fla. 2012) ........................................... 21

*Florida Dep't of Health & Rehab. Servs. v. S.A.P*,
    835 So. 2d 1091 (Fla. 2002) ............................................................ 21

*Freyre v. Gee*,
    No. 8:13-cv-2873, 2017 WL 1017837 (M.D. Fla. Mar. 15, 2017) ................................... 15

*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ........................................................ 9

*FTC v. LeadClick Media, LLC*,
    838 F.3d 158 (2d Cir. 2016)............................................................. 9

*Geller v. Von Hagens*,
    No. 08:10-cv-01688, 2011 WL 2434217 (M.D. Fla. June 13, 2011) ................................ 22

*Gritzke v. M.R.A. Holding LLC*,
    No 4:01-cv-495, 2002 WL 32107540 (N.D. Fla. 2003) .................................... 18

*Huon v. Denton*,
    841 F.3d 733 (7th Cir. 2016) ........................................................... 8

*In re Takata Airbag Prod. Liab. Litig.*,
    193 F. Supp. 3d 1324 (S.D. Fla. 2016) ........................................... 21

*J.S. v. Village Voice Media Holdings, L.L.C.*,
    359 P.3d 714 (Wash. 2015)............................................................. 7

*Jane Doe No. 1 v. Backpage*,
    817 F.3d 12 (1st Cir. 2016)............................................................. 1, 7

*Malibu Media, LLC v. Whaley*,
    No. 2:14-cv-510, 2015 WL 12852966 (M.D. Fla. May 14, 2015) ............................. 4

*Miccosukee Tribe of Indians of Florida v. S. Everglades Restoration All.*,
    304 F.3d 1076 (11th Cir. 2002) ...................................................... 16

*Nat'l Numismatic Certification, LLC v. eBay, Inc.*,
    No. 6:08-cv-42, 2008 WL 2704404 (M.D. Fla. July 8, 2008) ..................... 6, 11

*Ortega Trujillo v. Banco Cent. Del Ecuador*,
    17 F. Supp. 2d 1334 (S.D. Fla. 1998) ........................................... 19

*P'ship for a Sustainable Future, Inc. v. U.S. Fish & Wildlife Serv.*,
    No. 6:02-cv-414, 2002 WL 33883548 (M.D. Fla. July 12, 2002)................. 14

*Perfect 10, Inc. v. Google, Inc.*,
    No. 04-cv-9484, 2008 WL 4217837 (C.D. Cal. July 16, 2008)........................... 6

*Primerica Fin. Servs., Inc. v. Mitchell,*
    48 F. Supp. 2d 1363 (S.D. Fla. 1999) ............................................................................ 21

*Resnick v. AvMed, Inc.,*
    693 F.3d 1317 (11th Cir. 2012) ......................................................................... 15, 16

*Roca Labs, Inc. v. Consumer Opinion Corp.,*
    140 F. Supp. 3d 1311 (M.D. Fla. 2015) ......................................................... 9, 10

*Suarez v. Sch. Bd.,*
    No. 8:13-cv-01238, 2014 WL 1946536, (M.D. Fla. May 14, 2014) ................................ 19

*United States v. Jones,*
    29 F.3d 1549 (11th Cir. 1994) ......................................................................... 3

*Valderrama v. Rousseau,*
    No. 11-cv-24637, 2012 WL 12925174 (S.D. Fla. Sept. 18, 2012) ..................................... 23

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................................................ 15

*Young Apartments, Inc. v. Town of Jupiter, Fl.,*
    529 F.3d 1027 (11th Cir. 2008) ......................................................................... 16

**Statutes**

18 U.S.C. § 1591 ................................................................................................................ 29

18 U.S.C. § 1595 ................................................................................................................ 29

47 U.S.C. § 230 ........................................................................................................... passim

Fla. Stat. Ann. § 540.08 .................................................................................................. 21

Fla. Stat. Ann. § 770.01 .................................................................................................. 21

Fla. Stat. Ann. § 95.051 .................................................................................................. 24

Florida Abolitionist and Jane Doe (collectively "Plaintiffs"), by and through the

undersigned attorneys, respectfully submit this Opposition to Defendants' Motion to Dismiss

(the "Motion") and request that the Motion be denied.

## PRELIMINARY STATEMENT

In seeking dismissal of the Complaint, Defendants make grand statements about the

importance of Internet freedom and the First Amendment but largely ignore Plaintiffs'

specific allegations.  Those allegations, which must be credited for the purposes of this

Motion, assert that Defendants (1) are responsible for developing and creating content to

facilitate sex trafficking, and (2) manipulate content to conceal evidence of sex trafficking,

including monitoring content in bad faith.  Such activities are not protected by Section 230 of

the Communications Decency Act ("CDA"), 47 U.S.C. § 230, rendering dismissal on that

basis inappropriate.

Defendants attempt to avoid this conclusion by pointing to a recent decision by the

First Circuit granting Backpage immunity under the CDA.  *See Jane Doe No. 1 v. Backpage*,

817 F.3d 12 (1st Cir. 2016).  Critically, however, the plaintiffs in that case did not argue—as

Plaintiffs do here—that Backpage should face liability for its role in developing content, and

thus the First Circuit did not address the issue.  *Id.* at 19 n.4.  Moreover, Defendants' claimed

entitlement to CDA protection has recently been refuted by a report written by the U.S.

Senate Permanent Subcommittee on Investigations following a 20-month investigation into

Backpage's business practices, which Plaintiffs incorporated by reference in the Complaint

(the "Senate Report," attached hereto as Ex. A).  As the Senate Report explains, Backpage

"has long claimed that it is a mere host of content created by others and therefore immune

from liability under the Communications Decency Act (CDA)." Ex. A at 1. "The internal company documents obtained by the Subcommittee conclusively show," however, "that *Backpage's public defense is a fiction*." *Id.* (emphasis added). The reality is that Backpage's "practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created." *Id.*

Defendants continue their pattern of misrepresentations in the instant Motion, attempting to cast themselves as mere "intermediaries" engaging in "editorial" decisions. Motion at 3, 23. But the case law is clear that editing content is not protected by the CDA when a defendant's alterations materially contribute to the unlawful nature of the content, as Backpage's do here. *See Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1167 (9th Cir. 2008) (en banc). Indeed, the Senate investigation revealed that Defendants knowingly altered and added content for the express purpose of hiding evidence of criminal activity. *See* Ex. A at 2, 17-18. It is thus unsurprising that Backpage lost the only court ruling since the release of the Senate Report in which it attempted to invoke the CDA to immunize its facilitation of child sex trafficking. *See J.S. v. Village Voice Media Holdings, L.L.C.*, No. 12-211362-4 (Wash. Super. Ct. May 26, 2017) (attached hereto as Ex. B) (denying Backpage's motion for summary judgment on CDA grounds).

Because Plaintiffs sufficiently alleged the merits of their claims and have standing to bring them, and the CDA does not immunize Defendants, the Motion should be denied.

## FACTUAL BACKGROUND

Defendants' Motion relies heavily upon previous court decisions and avoids engaging directly with the allegations in the Complaint or acknowledging the Senate's factual findings about Backpage's complicity in developing and editing the content on its site. This evasive strategy is both unhelpful and legally improper. Contrary to Backpage's assertion (at p. 4, n.1) that that these findings are subject to judicial notice, opinions from other courts may be noticed only to recognize the *fact* of another litigation, not for "the truth of the matters asserted" therein. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citation omitted) ("If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous."). And even if they could properly be considered at this stage of the litigation (and they cannot), the judicial statements on which Defendants rely have since been flatly contradicted by evidence uncovered by the Senate investigation.[1]

At this stage of the litigation, the factual allegations set forth in the Complaint must govern the legal sufficiency of Plaintiffs' claims. Those allegations need not be repeated in detail here. It suffices to say that Plaintiffs allege Defendants create, develop, and edit content, and modify content provided by others for unlawful purposes, by:

1. Changing the text of advertisements, both manually and through an automated filtering system, to conceal evidence of criminal activity—including that many of the advertisements sell children for sex (Compl. ¶¶ 40-47, 76);

---

[1] For example, the Motion asserts (at pp. 6-7) that "Backpage blocks and removes posts and refers ads that may involve child exploitation to NCMEC" as part of its "screening" process. The Senate Report found something far different: that Backpage alters advertisements to remove words that would reveal the criminal nature of the ads and posts them anyway, not to protect users but to ensure they profit from the illegal sale of children and coerced women for sex. Ex. A. at 17-18.

2. Intentionally concealing their creation and modification of content, including when Defendant Larkin ordered Defendant Ferrer to keep their practices private to avoid prosecution and liability (Compl. ¶ 76);

3. Drafting sponsored advertisements for the Backpage.com website and later posting these advertisements on their affiliate websites (Compl. ¶¶ 37-39, 77-83);

4. Working directly with traffickers to "sanitize" their advertisements to illegally sell trafficked adults and children for sex without attracting law enforcement attention (Compl. ¶¶ 43-44, 54-56);

5. Advertising and driving traffic to the Backpage.com website by selecting, editing, and posting content to the Defendant-owned websites (Compl. ¶¶ 77-89);

6. Communicating with traffickers to help them post advertisements that conceal the criminal nature of the activity being advertised, thereby increasing the Backpage's revenue from illegal activity (Compl. ¶¶ 77-89); and

7. Helping traffickers evade detection, including stripping metadata from photographs at increased cost to Backpage and refusing to implement the type of identity verification that is required for other parts of the Backpage website (Compl. ¶¶ 63-67).

Thus, Plaintiffs allege that Defendants were responsible for developing, creating, and editing content, and monitored the content submitted by others in bad faith, to profit from the facilitation of sex trafficking.

## ARGUMENT

The "threshold to survive a motion to dismiss is exceedingly low." *Malibu Media, LLC v. Whaley*, No. 2:14-cv-510, 2015 WL 12852966, at *1 (M.D. Fla. May 14, 2015). At this stage, a court must accept all factual allegations as true and construe the complaint "in the light most favorable to the plaintiff." *Id.* (citation omitted). Detailed factual allegations are not required if the complaint includes "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.    SECTION 230 DOES NOT APPLY TO THE CLAIMS IN THIS ACTION.

Contrary to Defendants' assertion, Section 230(c) does not create "a general immunity from liability deriving from third-party content." *Barnes v. Yahoo!*, 570 F.3d 1096, 1100 (9th Cir. 2009). The fact that a website uses third-party content does not necessarily entitle it to protection under Section 230, because "to provide immunity every time a website uses data initially obtained from third parties would eviscerate" the text of the statute. *Id.* (internal citations omitted); *see also. Airbnb, Inc. v. City & Cty. of San Francisco*, No. 16-cv-03615, 2016 WL 6599821, at *4 (N.D. Cal. Nov. 8, 2016) (Section 230 "does not provide limitless immunity for online activity or conduct related to it").

Section 230(c), titled "Protection for 'Good Samaritan' blocking and screening of offensive material," contains two related provisions. The first prevents a website from being "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The second provision states in pertinent part that:

> No provider or user of an interactive computer service shall be held liable on account of—any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

*Id.* § 230(c)(2). Although courts have typically interpreted this language broadly, courts are clear that Section 230 should not be interpreted to "create a lawless no-man's-land on the Internet." *Roommates.com*, 521 F.3d at 1164; *see also Almeida v. Amazon.com, Inc.*, 456

F.3d 1316, 1321-22 (11th Cir. 2006) (Section 230's protection, while "broad," "does not apply without limitation").[2]

Courts in this district do not afford any special treatment to motions asserting a CDA defense, despite Defendants' protestation (at p. 9) to the contrary.  Instead, the "CDA statutory immunity is an affirmative defense which plaintiff is not required to negate in its Complaint."  *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265, 1273 (M.D. Fla. 2016); *Nat'l Numismatic Certification, LLC. v. eBay, Inc.*, No. 6:08-cv-42, 2008 WL 2704404, at *24 (M.D. Fla. July 8, 2008) (same).  When a pleading raises "fact-intensive" questions such as whether a defendant's "conduct disqualifies it for immunity under the CDA," it is "improper for the Court to resolve this issue on the pleadings."  *Perfect 10, Inc. v. Google, Inc.*, No. 04-cv-9484, 2008 WL 4217837, at *8 (C.D. Cal. July 16, 2008).

### A.    Plaintiffs Sufficiently Alleged Defendants' Liability as Content Providers.

As Defendants acknowledge (at p. 11), Section 230 applies only where a defendant would be held responsible for content created by others.  The statute offers no protection for "information content providers," defined in the CDA as persons who are "responsible, in whole *or in part*, for the creation or development of information provided through the Internet."  47 U.S.C. § 230(f)(3) (emphasis added); *see Roommates.com*, 521 F.3d at 1162.  Thus, it is not necessary for a website to be *solely* responsible for its content, if it played some role in its creation.  *Id.* at 1162-63 (noting that a website "can be both a service

---

[2] *See also Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669 (7th Cir. 2008) (Section 230 "as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts").

provider and a content provider").[3]  Because Defendants are alleged to have created at least

some of the content on their websites, they are not entitled to CDA protection.

Defendants wrongly assert (at p. 19) that "Plaintiffs' precise argument about content

'creation' has been rejected" in *Jane Doe No. 1 v. Backpage*, 817 F.3d 12 (1st Cir. 2016).  In

fact, the First Circuit acknowledged that it did not, and could not, address the issue of

whether Backpage could face liability as an "information content provider," because the

plaintiffs there failed to raise the argument.[4]  *Id.* at 19 n.4.  Conversely, when that argument

was made by the child trafficking victims in *J.S. v. Village Voice Media Holdings, L.L.C.*,

359 P.3d 714 (Wash. 2015), the Washington Supreme Court held that the plaintiffs had

properly pled claims that could survive Backpage's invocation of Section 230.  Although

Defendants attempt to distinguish this decision by claiming that the pleading standard there is

more lenient than the federal standard, the Washington court subsequently rejected

Backpage's summary judgment motion based on CDA grounds.  *See* Ex. B.  This is the only

ruling issued after the Senate Report that addresses Backpage's claimed entitlement to

Section 230 immunity, and by rejecting Backpage's arguments the court made clear that such

entitlement is—at a minimum—a question for a jury.

---

[3] *See also Perkins v. Linkedin Corp.*, 53 F. Supp. 3d 1222, 1248 (N.D. Cal. 2014) ("[T]he fact that users are information content providers does not preclude [the website] from also being an information content provider by helping develop at least in part [the relevant content].") (citation and internal punctuation omitted).

[4] The First Circuit also found many of the allegations in *Jane Doe No. 1* to be unduly speculative. *See, e.g.*, *Jane Doe No. 1.*, 817 F.3d at 25 ("This causal chain is shot through with conjecture: it pyramids speculative inference upon speculative inference."); *id.* ("[I]t is apparent that the attenuated causal chain proposed by the appellants is forged entirely out of surmise.").  Any concerns that Plaintiffs' allegations are mere speculation vanish in the face of the Senate Report and the extensive evidence underlying its findings.

Other courts have likewise recognized that civil liability is not precluded under Section 230 "for creating and posting, inducing another to post, or otherwise actively participating in the posting of a defamatory statement in a forum that that company maintains." *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016) (collecting cases).  For example, the Seventh Circuit recently refused to dismiss a case on CDA grounds in which the plaintiff based her defamation claims on comments attached to an article on the website. The court ruled that the CDA did not apply because the plaintiff sufficiently alleged that the website operated as an "information content provider" where it:

> (1) 'encouraged and invited' users to defame [the plaintiff], through selecting and urging the most defamation-prone commenters to 'post more comments and continue to escalate the dialogue'; (2) 'edited,' 'shaped,' and 'choreographed' the content of the comments that it received; (3) 'selected' for publication every comment that appeared beneath the [website's] article; and (4) employed individuals who authored at least some of the comments themselves.

*Id.*  The court rejected the argument that these actions were protected as "traditional editorial functions," since the plaintiff alleged that at least some of the problematic content was created by the website's employees.  *Id.*

Here, as in *Huon*, Backpage "actively participat[es]" in altering, drafting, and removing content "in a forum that [it] maintains" and "employed individuals who authored at least some of the content themselves."  *Id.*  The allegations in this case demonstrate that Defendants are not merely "intermediaries" hosting content, but are instead information content providers because they partially create the content on their websites.  *See* pp. 3-4, *infra.*  Nor are Backpage's actions protected as "traditional editorial functions," as Backpage claims (at p. 12) because the edits are directly related to and focused on the illegal sale of trafficked adults and children.

Moreover, Defendants may also face liability as content providers because their alterations of third-party content were designed to purposefully advance illegal conduct. Section 230 only bars liability for editing content where "the edits are unrelated to the illegality." *Roommates.com*, 521 F.3d at 1172.  In finding a website was not protected by Section 230 because it improperly filtered content, the Ninth Circuit explained:

> A website operator who edits user-created content–such as by correcting spelling, removing obscenity or trimming for length–retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality. However, a website operator who edits in a manner that contributes to the alleged illegality–such as by removing the word "not" from a user's message reading "[Name] did not steal the artwork" in order to transform an innocent message into a libelous one– *is directly involved in the alleged illegality and thus not immune*.

*Id.* (emphasis added).  Thus, websites may be liable if their actions "materially contribut[e] to [the] alleged unlawfulness" of the content.  *Id.* at 1168.  A "service provider loses immunity when it *substantively alters third-party content or becomes directly involved in the alleged illegality*."  *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1320 (M.D. Fla. 2015) (emphasis added).

In *FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009), the Tenth Circuit found that the CDA did not protect a website operator who paid for confidential phone records and sold them to customers because it "specifically encourage[d] development of what [was] offensive about the content."  *Id.* at 1199-1200 (holding that hosting "the offensive postings" was the defendant's "*raison d'etre* and it affirmatively solicited them").  Similarly, in *FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016), the Second Circuit held that an advertising broker was "not entitled to Section 230 immunity because it [was] an information content provider" when it "participated in the development of the deceptive content posted

on fake news pages" by "providing edits to affiliate webpages [and] purchasing media space on real news sites with the intent to resell that space to its affiliates." *Id.* at 174-76.  It reached this conclusion even though many of the allegations arose from the defendant's encouraging others to create certain content, editing of that content, and advertising the content. *Id.* at 176.  Nonetheless, the CDA could not protect the defendant because its actions "far exceeded that of neutral assistance" such that it was facing liability not as the "publisher or speaker" of the information, but as an active participant in its creation. *Id.* at 174-76.

So too here. This is a far different case than those in which a plaintiff tried to hold a defendant liable for "trimming for length" or making choices "among proffered material." *Roca Labs*, 140 F. Supp. 3d at 1319-20 (citations omitted).  Instead, Defendants are "directly involved in the alleged illegality." *Id.* at 1321.  Plaintiffs allege that Defendants altered the content of words and images on their sites to conceal their true criminal nature and to more effectively sell children and coerced women for sex.  Compl. ¶¶ 37-46.  Such conduct is not protected under the CDA.

**B.      Plaintiffs Have Properly Alleged That Defendants Monitored and Filtered Content In Bad Faith.**

Because Plaintiffs allege that Defendants monitored the content on their websites in bad faith, CDA immunity is also unavailable to Defendants.  There can be no dispute that Section 230(c)(2) contains a "good faith" requirement, which prohibits civil liability for "any action voluntarily **taken in good faith** to restrict access to or availability of" objectionable material. 47 U.S.C. § 230(c)(2) (emphasis added).  For this reason, courts will not dismiss a complaint based on the CDA where the complaint alleges that defendant monitored content

in bad faith.  *See, e.g.*, *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265, 1273 (M.D. Fla. 2016) (declining to dismiss a suit against Google on Section 230 grounds when the plaintiff alleged "that Google failed to act in good faith when removing its websites from Google's search results").[5]  In *National Numismatic Certification, LLC v. eBay, Inc.*, No. 6:08-cv-42, 2008 WL 2704404 (M.D. Fla. July 8, 2008), the court refused to dismiss a suit against eBay on CDA grounds where eBay was alleged to have filtered and selected content in bad faith.  *Id.* at *24.  The court explained that Section 230(c)(2) does not create "an absolute immunity or privilege," but instead limits the statute's protection by adding a "good faith" requirement.  *Id.*

Defendants attempt to avoid the "good faith" requirement in Section 230(c)(2) by arguing that they are only invoking Section 230(c)(1) and that that subsection does not require good faith. But the Complaint makes numerous, detailed allegations that directly implicate Defendants' role in "restricting access or availability of" certain information, conduct that plainly falls within the scope of Section 230(c)(2).  *See* Compl. ¶¶ 48-56.  Because Plaintiffs' monitoring and filtering allegations do not treat Defendants as the "publisher or speaker" of information, which would potentially implicate Section 230(c)(1), any entitlement to immunity for their conduct ***must*** rely on Section 230(c)(2).  Thus, as a concurring justice of the Washington Supreme Court noted in addressing Backpage's

---

[5] *See also Moving & Storage, Inc. v. Panayotov*, No. 12-cv-12262, 2014 WL 949830, at *2-3 (D. Mass. Mar. 12, 2014) (noting that Section 230(c)(2) is the "applicable section" to allegations based on content monitoring, and because Section 230(c)(2) does not protect those acting in bad faith, "the CDA does not mandate dismissal of any of the claims at this time"); *Smith v. Trusted Universal Standards In Elec. Transactions, Inc.*, No. 09-cv-4567, 2010 WL 1799456, at *6 (D.N.J. May 4, 2010) ("[T]he Court cannot grant immunity on the present record because it is not clear that Comcast acted in good faith.").

argument that Section 230(c)(2)'s good faith requirement does not apply to it, "it would be absurd to ignore" the text of Section 230(c)(2) "in order to protect the actions of Backpage.com, taken in bad faith, that have nothing to do with publishing or speaking another's content." *See J.S.*, 359 P.3d at 720 (Wiggins, J., concurring).[6]

### C.     Ms. Doe's Right-of-Publicity Claim is Excluded from Section 230.

Section 230 unequivocally states that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2).  Under a plain reading of this language, Doe's claim for invasion of privacy and violation of her right of publicity (Count IV) is unaffected by the CDA.  *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1324 (11th Cir. 2006) (declining to reach the issue, but collecting authorities supporting application of Section 230(e)(2) to Florida's right of publicity law).  Indeed, because the right of publicity is a "'widely recognized intellectual property right,'" a right of publicity claim "arises out of a 'law pertaining to intellectual property' within the meaning of the statute." *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 302 (D.N.H. 2008) (quoting *Almeida*, 456 F. 3d at 1322 and 47 U.S.C. § 230(e)(2)).  Courts recognize that the right of publicity is a form of intellectual property right.  *See, e.g., Almeida*, 456 F.3d at 1322-23 (noting that "there appears to be no dispute that the right of publicity is a type of

---

[6] This argument also fails because Section 230(c)(1) and 230(c)(2) fall under the same title, meaning that both sections are intended to provide "Protection for 'Good Samaritan' blocking and screening of offensive material." 47 U.S.C. § 230(c).  Requiring that a website be a "Good Samaritan" comports with this language and congressional intent. *See Roommates*, 521 F.3d at 1163-64 ("Indeed, the section is titled 'Protection for 'good samaritan' blocking and screening of offensive material" and, as the Seventh Circuit recently held, the substance of section 230(c) can and should be interpreted consistent with its caption.") (citing *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669-70 (7th Cir. 2008)).

intellectual property right").[7]  Defendants selectively cite Black's Law Dictionary's definition of "intellectual property" (at p. 22), but they omit a critical sentence from that definition that states the term "intellectual property" "includes trade-secret rights, *publicity rights*, moral rights, and rights against unfair competition."  Black's Law Dictionary (10th ed. 2014) (emphasis added).  Based on this plain meaning, Section 230(e)(2)'s intellectual property exception must apply to Ms. Doe's right of publicity claim.

### D.     Section 230 Cannot Reasonably Be Interpreted To Give Defendants Immunity For Willfully Facilitating Sex Trafficking.

All of the foregoing reasons are more than sufficient to deny the instant Motion.  But even putting them aside, there is another compelling reason why the CDA does not protect Defendants here:  it would be absurd to interpret Section 230 to immunize the willful facilitation of child sex trafficking, a result Congress could not possibly have intended when it enacted a statute intended to promote content monitoring as a way to *protect* children.[8]  Congress had enacted Section 230 to address a contradiction that existed previously in the case law:  if a website chose to monitor its site to remove offensive postings, it could face civil liability, but a website doing nothing would face no liability.  *See Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1014 (Fla. 2001).  Thus, website operators had an incentive to *avoid* all content monitoring on their sites.  *Id.*

---

[7] *See also Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1448 (11th Cir. 1998) (criticizing a party's distinction "between what is protected by the right of publicity and what is protected by *other forms* of intellectual property rights, such as copyright" (emphasis added)); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 928 (6th Cir. 2003) ("The right of publicity is an intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or her identity.").

[8] In 1996, Congress enacted Section 230(c) of the Communications Decency Act ("CDA") as part of a comprehensive bill designed to "clean up the Internet" to make it safe for children by prohibiting obscenity and encouraging the use of technology to monitor potentially offensive content.  141 Cong. Rec. S8087 (daily ed. June 9, 1995) (statement of Sen. Exon); 47 U.S.C. § 230(b).

Section 230 was enacted to switch this equation by protecting websites who engage in good-faith monitoring.[9]  In keeping with this purpose, it would make no sense to immunize a website like Backpage that monitors the content on its site not to protect the public, but to harm it by willfully facilitating criminal activity.[10]

## II.    THERE IS NO BASIS FOR DISMISSING PLAINTIFFS' CLAIMS.

### A.  Plaintiffs Have Standing to Bring These Claims.

Plaintiffs Jane Doe and Florida Abolitionist have sufficiently alleged a particularized "injury in fact" that is fairly traceable to Defendants.[11]  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss the Court presumes that general allegations embrace those specific facts that are necessary to support the claim."  *P'ship for a Sustainable Future, Inc. v. U.S. Fish & Wildlife Serv.*, No. 6:02-cv-414, 2002 WL 33883548, at *2 (M.D. Fla. July 12, 2002) (internal quotations omitted).  At this stage, Plaintiffs need only allege that Defendants indirectly caused or contributed to the harm alleged.  *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260-61 (1977) (explaining that for standing purposes the "injury may be indirect").  Traceability "**requires something less than the concept of**

---

[9] *See* 47 U.S.C. § 230(b) (Section 230 was introduced "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services" and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material.").

[10] Backpage also cannot claim First Amendment protection for its conduct, as  it is well-established that the First Amendment does not protect criminal activity.  *See Conant v. McCaffrey*, 172 F.R.D. 681, 698 (N.D. Cal. 1997).

[11] Defendants do not contest that Florida Abolitionist has organizational standing—nor could they.  *See Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014).

14

**'proximate cause'"** and "harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Freyre v. Gee*, No. 8:13-cv-2873, 2017 WL 1017837, at *2 (M.D. Fla. Mar. 15, 2017) (emphasis added) (internal quotations omitted); *see also Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (same). Here, Plaintiffs alleged that Defendants directly and intentionally caused their harm.

Plaintiffs allege that Backpage plays an active role in every single advertisement before posting it on its website (Compl. ¶ 40), including the advertisement posted in connection with Ms. Doe, and that Backpage "creates, develops, and posts illegal content intended to sell trafficked adults and children in the 'Sponsored Ads' part of the 'Adults Services' section of its website." *Id.* ¶ 37. In great detail, Plaintiffs alleged that "Defendants actively participate in the creation of advertisements that traffic children by providing content" and that they "**rewrite** the advertisements in part to obscure the illegal activity—the sale of a trafficked adult or child for sex." *Id.* ¶ 6 (emphasis added); *see also id.* ¶¶ 38-56. Plaintiffs further alleged that the traffickers and Backpage are engaged in a mutually beneficial financial relationship and conspire to advertise trafficking victims in multiple locales simultaneously thereby increasing the supply of, demand for, and profit generated by trafficked victims. *Id.*; *see also* ¶¶ 83-97.

Individually, Ms. Doe alleged that "Defendants knowingly participated in, and benefitted financially from" her "unlawful sexual exploitation." *Id.* ¶ 9. Florida Abolitionist alleged that "Backpage's participation in, and facilitation of, sex trafficking has increased the number of trafficked adults and children that Florida Abolitionist treats" and caused it "to expend more resources providing services to trafficked adults and children than it would

have otherwise, thereby decreasing, diverting, and draining the resources devoted to its main mission of preventing and ending human trafficking." *Id.* ¶¶ 10, 108-10, 113-14.

Plaintiffs more than satisfy the standing requirements in the Eleventh Circuit based on clear precedent. *See, e.g., Resnick*, 693 F.3d at 1324 (reversing grant of motion to dismiss for lack of standing where plaintiffs alleged that corporate defendant caused their identity theft because corporation failed to encrypt and secure laptops from which a third party stole plaintiffs' identity); *Young Apartments, Inc. v. Town of Jupiter, Fl.*, 529 F.3d 1027, 1037-39 (11th Cir. 2008) (reversing district court's grant of motion to dismiss on standing grounds where landlord alleged that town's discriminatory housing practices, including selective enforcement of ordinances and building inspections, harmed landlord and its tenants); *Miccosukee Tribe of Indians of Florida v. S. Everglades Restoration All.*, 304 F.3d 1076, 1080-81 (11th Cir. 2002) (affirming standing where plaintiff alleged that a third party relied on defendant's report to implement policy changes that harmed plaintiff).

Defendants' purported authority (at pp. 24-25) is inapplicable because all of these cases involve a specific kind of lawsuit not at issue here: *pre-enforcement actions* challenging the validity of a law that has not yet been, meaning that the plaintiff has not yet suffered any harm except possible future enforcement of the law.[12] Here, however, Plaintiffs have alleged that Defendants' actions caused them concrete harm.[13] Thus, Defendants'

---

[12] *See, e.g., Wollschlager v. Gov. of Florida*, 848 F.3d 1293, 1304-05 (11th Cir. 2017) (en banc) (describing alleged harm in pre-enforcement lawsuit challenging law on First Amendment grounds); *Cone Corp. v. Florida DOT*, 921 F.2d 1190 (11th Cir. 1991) (alleging fear of unfair treatment in future as result of promulgated regulation); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (alleging that potential extra-territorial application of environmental regulation could cause future harm).

[13] Similarly, *Nicklaw v. Citimortgage*, 839 F.3d 998, 1003 (11th Cir. 2016) (*cited in* Motion at 24), is inapposite because in *Nicklaw*, the plaintiff failed to allege *any* harm whatsoever and therefore lacked standing.

purported authority is nothing more than a distraction.[14]  Plaintiffs have each separately

alleged concrete, particularized injuries caused by the Defendants.

### B.     Ms. Doe Has Sufficiently Alleged Her Right-of-Publicity Claims.

Contrary to Defendants' argument otherwise, Ms. Doe alleged that Defendants used

her image, photograph, and likeness for their own commercial benefit.  She also alleged that

80% of Backpage's revenue is derived from online commercial sexual advertisements and

that Defendants "knowingly participated in, and benefited financially from, the unlawful

sexual exploitation of Plaintiff Doe." *Id.* ¶¶ 9, 24; *id.* ¶¶ 1, 7, 32, 34-36 (explaining

Defendants' active role in sex trafficking and intent to promote advertisements to increase

their own profit).  Ms. Doe further alleged that Defendants actively manipulate the

photographs and strip metadata from every photograph included in a trafficking

advertisement thereby altering its content to protect their business model and profitability.

*Id.* ¶ 85.  Moreover, she alleged that Backpage independently posts and re-posts content—

including photographs of trafficked victims—on its affiliated websites, BigCity and

EvilEmpire for profit.  *Id.* ¶¶ 77-83.

Defendants' citation (at p. 26) to *Jane Doe No. 1 v. Backpage*, 817 F.3d 12, as

purported support for the dismissal of the right-to-publicity claim is misguided.  In *Jane Doe*

*No. 1*, the First Circuit made clear that plaintiff failed to allege that Backpage's "activities

---

[14] Defendants misleadingly excerpt *Doe v. Backpage.com LLC*, 817 F.3d 12 (1st Cir. 2016).  Motion at 25 n.17. In that excerpt, the First Circuit addressed Doe's alleged causal link between Backpage's misrepresentations to anti-trafficking advocacy groups and their state law claim for unfair trade practices.  *Id.* at 25.  Plaintiffs do not make related claims and do not allege misrepresentations to third parties for causation purposes.

amount to creating the content of the advertisements." *Id.* at 19-20, 19 n.4.  Here, Plaintiffs have explicitly alleged that Defendants create the content of the advertisements.[15]

Indeed, Plaintiffs alleged that Defendants create and provide content that impacted and controlled the manner in which Ms. Doe's photograph was displayed.  Compl. ¶¶ 37-56.  Courts within the Eleventh Circuit have upheld similar right-to-publicity claims based on similar facts.  *See, e.g.*, *Gritzke v. M.R.A. Holding LLC*, No 4:01-cv-495, 2002 WL 32107540, at *1 (N.D. Fla. 2003) (upholding claim under Fla. Stat. § 540.08 where *Girls Gone Wild* videotape was advertised online and plaintiff was intentionally made the focus of that advertisement and defendant's website); *Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1310 (M.D. Fla. 2010) (same).[16]

## C.  Ms. Doe Sufficiently Alleged a Timely Defamation Claim.

Defendants incorrectly assert (at p. 27) that Ms. Doe was required to serve Defendants with a retraction notice in order to bring this defamation claim.  Fla. Stat. Ann. § 770.01 requires a retraction notice to be served before "any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium. . ."  "The presuit notice requirement of section 770.01 applies to allegedly defamatory statements made in such a public medium ***the purpose of which is the free dissemination of news or analytical comment on matters of public concern.*** " *Comins v. Vanvoorhis*, 135 So. 3d 545, 560 (Fla.

---

[15] Defendants' resort to *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006) is equally unavailing for the same reasons.  In *Almeida*, the Eleventh Circuit did not reach the issue of whether plaintiff could bring a right-to-publicity claim because it found the defendant had no role in designing the book cover containing plaintiff's image and did not "make editorial choices as to the book cover images" on the website. *Id.* at 1326.

[16] *See also Bilotta v. Citizens Information Associates*, No. 8:13-cv-2811, 2014 WL 105177, at *1 (M.D. Fla. Jan. 10, 2014) (denying motion to dismiss right-of-publicity claim based on a website's publication of mug shots and charging a fee to remove those photographs).

Dist. Ct. App. 2014) (emphasis added).  When determining whether a defendant is subject to the pre-suit notice requirement, courts evaluate "whether the defendant engages in the traditional function of the news media, which is to initiate uninhibited, robust, and wide-open debate on public issues." *Tobinick v. Novella*, No. 9:14-cv-80781, 2015 WL 1191267, at *8-9 (S.D. Fla. Mar. 16, 2015).  Here, Defendants are not subject to the pre-suit notice requirement because they do not engage in the traditional function of the news media, nor do their websites disseminate news to the public.  *See, e.g.*, *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1337-38 (S.D. Fla. 1998) (public relations firm was not subject to § 770.01 because it did not "issue unsolicited, disinterested and neutral commentary as to matters of public interest, or editorialize as to matters of public interest without being commissioned to do so by its clients").

Ms. Doe's defamation claim is timely because Defendants should be equitably estopped from asserting the affirmative defense of the statute of limitations.  "The expiration of a statute of limitations is an affirmative defense" and a "plaintiff is not required to negate an affirmative defense in his or her complaint." *Barnett v. Blane*, No. 11-cv-14345, 2012 WL 12862653, at *3 (S.D. Fla. July 3, 2012).  Pleading a defamation claim requires alleging that the defendant acted negligently when publishing the statement. *Suarez v. Sch. Bd.*, No. 8:13-cv-01238, 2014 WL 1946536, at *2 (M.D. Fla. May 14, 2014).  Until the Senate Report disclosed internal Backpage documents (made available by virtue of its subpoena power (Compl. ¶ 8)), Defendants' own statements and claims made it impossible for Ms. Doe to allege defamation because Defendants equated Backpage to a passive website in which

Defendants played no part in the creation of the advertisements and claimed that they worked
to prevent sex trafficking advertisements from being featured.  *Id.* ¶ 31.

At the time of the publication of the advertisement, Backpage was actively concealing
the role it played in the moderation, editing, authoring, and review process related to the
advertisements for trafficking victims.  *Id.* ¶¶ 31-33, 40-44, 50, 54-56, 72-76.  Backpage also
concealed the role the other Defendants, including Ferrer and Backpage's affiliate websites,
played in this process and in advertising sex trafficking victims.  *Id.*  Indeed, Defendants
actively claimed that they played no role in the creation of any of the content on their
website.  *Id.*  Citing to internal Backpage communications, Ms. Doe alleged that "Defendants
have explicitly instructed Backpage employees to hide their actions of creating content in
order to ensure that courts would not understand that Defendants create content and author
advertisements."  *Id.* ¶ 76.  As alleged in the Complaint, in July 2011, Defendant Larkin
wrote to Defendant Ferrer "cautioning him against Backpage's moderation practices 'being
made public. ***We need to stay away from the very idea of 'editing' the posts as you know.***'"
*Id.* (emphasis added).

Under these circumstances, where Defendants seek to benefit from their own
statements that prevented Ms. Doe from bringing the defamation claim, Defendants should
be equitably estopped from asserting the statute of limitations defense.  "Equitable estoppel
presupposes a legal shortcoming in a party's case that is directly attributable to the opposing
party's misconduct.  The doctrine bars the wrongdoer from asserting that shortcoming and
profiting from his or her own misconduct."  *Florida Dep't of Health & Rehab. Servs. v.
S.A.P*, 835 So. 2d 1091, 1097 (Fla. 2002).   For the same reasons, this deception separately

merits equitably tolling the statute of limitations.[17] *See, e.g., In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1344 (S.D. Fla. 2016) (equitable tolling applies under Florida law where defendant's fraud prevented plaintiff from knowing necessary elements of her cause of action). Defendants are equitably estopped from asserting a statute of limitations defense and the statute of limitations should be equitably tolled because Defendants' intentional concealment made it impossible for Ms. Doe to bring this lawsuit sooner.

### D.     Ms. Doe's Other Claims Are Not Barred by the Single Action Rule.

Because Ms. Doe sufficiently and timely alleged defamation, *see* Part II.C, the single action rule is inapplicable. *See, e.g., Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1326 n.1 (S.D. Fla. 2012) ("Because the Court declines to dismiss the defamation claim for lack of § 770.01 notice, the Court need not discuss the single-action rule in depth here."); *Primerica Fin. Servs., Inc. v. Mitchell*, 48 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999) (refusing to dismiss plaintiffs' tortious interference claim and noting that "the Court has no reason to hold that a defamation claim would necessarily be dismissed"); *see also Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. Dist. Ct. App. 2002).

In any event, even if the single action rule applied—which it does not—it would not bar Plaintiffs' other causes of action because each of these claims relies upon independent facts separate from the defamation claim. *See, e.g., Geller v. Von Hagens*, No. 8:10-cv-

---

[17] The statute of limitations should also be tolled pursuant to Fla. Stat. Ann. § 95.051(1)(C) which courts have interpreted as tolling the statute of limitations in the case of fraudulent concealment. *See, e.g., Carroll v. TheStreet.com, Inc.*, No. 11-cv-81173, 2014 WL 5474061, at *5 (S.D. Fla. July 10, 2014). Because, however, equitable estoppel and equitable tolling are not precluded by § 95.051(1)(C), the Court need not apply this statute to toll the statute of limitations. *See, e.g., id.* ("the doctrine of equitable tolling may be used by courts to prevent injustice regardless of the legislative constraints in section 95.051"); *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1079 (Fla. 2001) (same).

01688, 2011 WL 2434217, at *4 (M.D. Fla. June 13, 2011) (denying summary judgment motion on the grounds of the single action rule where the plaintiffs alleged that separate conduct supported the defamation claim and the tortious interference claim); *Brown v. Suncoast Beverage Sales, LLP*, No. 2:09-cv-498, 2010 WL 555675, at *3 (M.D. Fla. Feb. 10, 2010) (same).

As a preliminary matter, the outrage, civil conspiracy, and negligence claims are alleged on behalf of both Ms. Doe and Florida Abolitionist and thus necessarily include conduct and allegations separate and apart from the discrete conduct related to Ms. Doe's defamation claim.[18] Ms. Doe's individual assertion of these claims relies upon independent facts: (a) The outrage claim includes the allegation that Defendants openly participate in, facilitate, and profit from sex trafficking beyond the publication of Ms. Doe's photograph—including intentionally trafficking children for sexual acts (Compl. ¶ 126); (b) among multiple distinct facts, the civil conspiracy claim includes the allegation that Defendants conspired internally to launder funds to conceal illegal activity (*see infra* Part II.E); (c) the negligence claim includes the allegation that Defendants breached the duty to avoid facilitating human trafficking (Compl. ¶¶ 145-46); (d) the invasion of privacy claim alleges that Defendants wrongfully intruded into Ms. Doe's private affairs (*id.* ¶ 131); (e) the right-to-publicity claim alleges that Ms. Doe's image, name, and likeness were used for advertising purposes without her consent. *Id.* ¶ 136. Thus, even if the single action rule applied to these claims—which it does not—the claims brought by Florida Abolitionist could not, under any

---

[18] Defendants do not argue—nor could they—that the outrage, civil conspiracy, and negligence claims brought by Florida Abolitionist should be dismissed pursuant to the single action rule.

circumstances, be dismissed and the claims brought by Ms. Doe should not be dismissed because they rely upon factual allegations independent from the defamation claim.

### E. Plaintiffs Have Sufficiently Alleged Civil Conspiracy.

Contrary to Defendants' argument (at pp. 29-30), Plaintiffs have sufficiently alleged a civil conspiracy. "Civil conspiracy can be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Valderrama v. Rousseau*, No. 11-cv-24637, 2012 WL 12925174, at *7 (S.D. Fla. Sept. 18, 2012) (applying Florida law) (internal quotations omitted). "The agreement need not be express, but rather, may be inferred from the nature of the acts done, the relation between the conspirators, their mutual interests in the matter, and other circumstances." *Chanel, Inc. v. 2012-Chanel.com*, No. 1:12-cv-22482, 2013 WL 12171738, at *5 (S.D. Fla. Mar. 20, 2013) (applying Florida law) (internal quotations omitted); *see also Charles v. Florida Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. Dist. Ct. App. 2008) (same).

Citing no authority, Defendants improperly suggest that civil conspiracy is subject to a heightened pleading standard which would require alleging the "who, what, when, where, and how" of the conspiracy. Motion at 29. Civil conspiracy is not subject, however, to the heightened pleading requirements of Fed. R. Civ. P. 9(b).[19] And even if Plaintiffs were subject to the heightened pleading requirement—which they are not—the Complaint would still sufficiently allege conspiracy. Plaintiffs allege that Defendants directly communicated

---

[19] That heightened pleading requirement only applies to allegations of conspiracy to defraud. *See Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel Ltd.*, No. 10-cv-22153, 2011 WL 4434891, at *6 (S.D. Fla. Sept. 23, 2011) ("Here, as Plaintiffs' civil conspiracy claim is based on fraud, the heightened pleading standards in Rule 9(b) apply" thus requiring that plaintiff allege the "who, what, where, when, how of the alleged conspiracy").

with traffickers to teach them how to craft advertisements that sell trafficked adults and children without attracting law enforcement's attention—thus Defendants conspired to simultaneously advance and hide their illegal activity. Compl. ¶¶ 37-39, 48-56, 50-56, 60-62. Plaintiffs further alleged that Defendants manipulated their payment systems to allow traffickers to use Bitcoin to ensure that traffickers' payments for the illegal advertisements would not attract law enforcement's attention to their joint enterprise. *Id.* ¶¶ 65-69.

The Complaint also alleges a conspiracy among the Defendants, themselves, in addition to their conspiracy with the traffickers.[20] For example, Plaintiffs allege that a Backpage employee instructed other Backpage employees not to provide any reports to law enforcement concerning advertisements on Defendants' separate websites EvilEmpire and BigCity. *Id.* ¶ 89. Plaintiffs further allege that the separate Defendant websites conspired with each other to advertise and sell trafficking victims. *Id.* ¶¶ 77-83. Plaintiffs also allege that Defendants conspired to intentionally launder the funds from the traffickers through the use of the third-party entity Postfaster. *Id.* ¶ 87. These allegations are sufficient to demonstrate an agreement to conspire and an actual conspiracy.

### F.    Ms. Doe Has Stated A Claim Under the TVPRA.

Ms. Doe has sufficiently stated a claim for civil remedies for Defendants' violations of 18 U.S.C. §§ 1591 and 1595. Section 1591(a) creates liability when a defendant advertises a trafficked victim and, separately, when a defendant benefits financially from a

---

[20] Defendants wisely do not claim that Defendant Ferrer's communications with Backpage's employees cannot be considered as part of the conspiracy—nor could they—as Plaintiffs' allegations are subject to the criminal activity exception to the intra-corporate conspiracy doctrine. "The Eleventh Circuit has recognized that the criminal conspiracy exception to the intra-corporate conspiracy doctrine applies in civil cases where the underlying conduct could support a criminal action." *Solyom v. World Wide Child Care Corp.*, No. 14-cv-80241, 2015 WL 6167411, at *2 (S.D. Fla. Oct. 15, 2015).

venture engaged in sex trafficking or advertising sex trafficking.  18 U.S.C. § 1591.  Section

1595 identifies the civil remedies available to victims of the violations of 18 U.S.C. § 1591.

Ms. Doe alleges both that Defendants advertised her with knowledge that she was a victim of

sex trafficking *and* that Defendants knowingly profited from this sex trafficking venture.  *See*

Compl. ¶¶ 19, 98-101, 116-18.

Ms. Doe alleged that Defendants participate in the creation of the content of all

advertisements posted on their website.  *Id.* ¶ 40.  Ms. Doe further alleged that "Defendants

knowingly participated in, and benefitted financially from" her "unlawful sexual

exploitation."  *Id.* ¶ 9.  Backpage "creates, develops, and posts illegal content intended to sell

trafficked adults and children in the 'Sponsored Ads' part of the 'Adults Services' section of

its website."  *Id.* ¶ 37.  Backpage, itself, claims to screen every advertisement that is posted

on its website, and Ms. Doe alleged—and the United States Senate has found—that

Backpage sanitized millions of advertisements that had obvious red flags of sex trafficking,

including during the period in which Ms. Doe was trafficked on Backpage.  *Id.* ¶¶ 40-47, 50,

54-56, 98-99.  Without discovery, only Backpage knows how exactly it sanitized the

advertisement for Ms. Doe, and dismissal on this basis is inappropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny

Defendants' Motion in its entirety.  In the alternative, if this Court is inclined to dismiss any

of Plaintiffs' claims, Plaintiffs request leave to amend the Complaint.

Dated: June 9, 2017

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By:   /s/ Karen C. Dyer
     Karen C. Dyer (Fla. Bar. No. 716324)
     121 South Orange Avenue, Suite 840
     Orlando, FL 32801
     Telephone: (407) 245-8793
     Facsimile:  (407) 425-7047
     kdyer@bsfllp.com

     David Boies (*pro hac vice*)
     333 Main Street
     Armonk, NY 10504
     Telephone: (914) 749-8200
     Facsimile:  (914) 749-8300
     dboies@bsfllp.com

     Karen A. Chesley (*pro hac vice*)
     Joanna Wright (*pro hac vice*)
     Alexander Boies (*pro hac vice*)
     575 Lexington Avenue
     New York, NY 10022
     Telephone: (212) 446-2300
     Facsimile:  (212) 446-2350
     kchesley@bsfllp.com
     jwright@bsfllp.com
     aboies@bsfllp.com

**LEGAL MOMENTUM**

     Penny Venetis (*pro hac vice to be filed*)
     16 East 34th Street
     New York, NY 10016
     Telephone: (212) 413-7544

     *Attorneys for Plaintiffs Florida Abolitionist*
     *and Jane Doe*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system on this 9th day of June, 2017.

/s/ Karen C. Dyer
Karen C. Dyer